[No. 6636.]

## WILEY V. THE PEOPLE.

. 1. CRIMINAL LAW—*Murder*—One resisting an assault uses force not greatly disproportionate, according to all the circumstances of the situation, or uses a weapon from the use of which death would not naturally or ordinarily result, and through accident, or without due caution, kills his assailant, he is not guilty of murder—(579).

2. ——*Instructions*—Plaintiff in error was convicted of murder in the second degree. He defended on the ground of misadventure, or that, at most, his offense was involuntary manslaughter. The trial court instructed upon the mistaken assumption that defendant defended on the ground that he gave the fatal blow in self defense, and withdrew from the jury the defense of involuntary manslaughter. *Held* fatal error—. (578).

*Error to Weld District Court*—Hon. HUBERT L. SHATTUCK, Judge.

Mr. WILLIAM H. TRINDLE for plaintiff in error.

Hon. BENJAMIN GRIFFITH, attorney general, Mr. CHARLES O'CONNER, assistant attorney general, Mr. GEORGE A. CARLSON, district attorney for the people.

Mr. JUSTICE WHITE delivered the opinion of the court:

E. Wiley was charged with the murder of Swan Hager. Upon trial, he was convicted of murder in the second degree, and sentenced to the penitentiary for a term of not less than ten or more than eleven years.

The defendant and Hager, in company with several other men, were at the Shamrock Coal Mine in Weld county, where they had congregated with their wagons and teams for the purpose of purchasing coal and hauling the same to their respective homes. Wiley and deceased were not acquainted, though they had seen each other a few times, and there was no unfriendly feeling between them. There was some evidence tending to show that deceased, during the afternoon, became somewhat intoxicated. At the mine was a barn which had been provided by the management of the coal company for the purpose of accommodating those who were detained over night. Under the rules governing the use of the barn, those desiring stalls therein could reserve the same, as against other claimants, by tying their halters in the stalls, or placing feed in the feed boxes. Wiley, in accordance with such rules, appropriated stalls for his own team and that of two teams driven to the mines by his sons earlier in the day. About 5 o'clock deceased, and other members of his party, drove to the barn and unhitched their horses, and deceased inquired of Wiley if there were

any vacant stalls, and was informed that all stalls on that particular side of the barn had been appropriated, as evidenced by the halters and feed. Wiley's wagon was standing about ten feet east, and a little south, of the southeast corner of the barn, with the tongue pointing to the southwest. There was a door on the south side, and also another on the north side of the barn. Just before the conversation detailed above, Wiley had been engaged in gathering up hay or straw, with a short handled, three-tined pitchfork, at a point about twenty feet east, and a little south of the northeast corner of the barn, and carrying it into the stalls for bedding purposes. Immediately after the conversation Wiley resumed this work, and observing Hager in the act of tying his team to the rear of Wiley's wagon, requested him not to do so, as the team would destroy his grain. Hager thereupon used some profanity, and several times wanted to know of Wiley if he was afraid the team would eat the wood on the wagon. To this Wiley made no answer, but continued at his work raking up hay or straw. Hager untied his team, and holding the halters thereof in his left hand, said to Wiley: "To hell with you and your halters", and shortly afterwards started walking rather rapidly toward Wiley, leading his team with his left hand,—as claimed by Wiley and his witnesses, —and extending or holding his right hand in a threatening attitude as if to strike. Wiley told Hager to stop, that he wanted no trouble with him, and repeated the request two or three times, to which deceased paid no attention. Deceased advanced on Wiley, the latter retreating two or three steps, until, as he testified, he was almost against a wire fence, when, as he and his witnesses claim, deceased was about to strike or jump upon him, he reversed the pitchfork, and struck Hager with the handle, the blow falling on the left side of the head, inflicting a scalp wound two inches

in length. Wiley made no attempt to strike a second blow, but, as he claims, waited to see whether Hager would press the attack further. The latter was felled by the blow, but immediately got up, and led his team away. Thereupon Wiley resumed his work. The latter had on a heavy coat, a pair of mittens and overshoes, and testified, that he had been sick for some time, very lame in the back, and unable to do any work, and that he had no other intent in striking deceased than simply to keep him off, and "did not pick out his head or any other particular place to strike."

Some of the witnesses for the people testified, that they did not observe any threatening attitude on the part of Hager as he advanced towards Wiley, and thought that Hager's right hand was not uplifted at all. The theory advanced by counsel for the people was, that while Hager, with his left hand was leading his horses along the east side of the barn, towards the north door thereof, with intent to put them in the barn, he was, without provocation, viciously and unlawfully assaulted by Wiley.

Within two or three hours after the difficulty a physician dressed the wound inflicted on the deceased, and thereafter, from day to day, the deceased visited physicians for the purpose of having the wound treated. About February 22d his physician, concluding that Hager was in a dangerous condition, sent him to the hospital at Greeley, where the skull under the wound was trepanned. That night, or the next morning, Hager died. The physicians attending deceased and making the autopsy, testified that there was no fracture of the skull, or any injury to the brain or its tissues, arising directly from the blow, and that the immediate cause of death was septic inflammation of the brain, caused by the emissary veins carrying from the external wound to the brain, poison arising from the infection of the wound in the scalp.

The court in its instructions, told the jury that Wiley relied upon the plea of self-defense, and gave the usual instructions upon that theory. And, contrary to the facts in evidence, specifically instructed that "the defendant has testified in this case that he was in actual fear of losing his life, or of receiving great bodily harm at the time he struck deceased with the pitchfork." The court also, after defining the two grades of manslaughter, instructed the jury that involuntary manslaughter "is eliminated from your consideration in this case, because there is no evidence whatever to sustain it".

The court evidently misconceived the nature of the defense on which Wiley relied. It was not that he struck the blow to save his own life, or to prevent the infliction of great bodily harm, but that he was assailed by Hager, and in resisting the attack, and because of his manner of dress and weakened condition, and in order to put himself upon an equality with Hager, he struck the latter with an instrument, not necessarily a deadly weapon, or which, from the use made of it, could be presumed to be a deadly weapon, and that in so doing, but without any such intention, he unfortunately struck the blow which, probably, eventually resulted in Hager's death, and that the homicide was entirely accidental, or the result of misadventure, and therefore excusable, or at most could be no greater crime than involuntary manslaughter.

The prejudice to plaintiff in error consisted, not only in failing to state the true character of the defense, but, as stated in *Nilan v. The People*, 27 Colo. 206, 211, "* * * * especially in submitting to the jury a defense that was not made, and in support of which there was not a particle of evidence. There being no such defense as that submitted,—consequently there being no evidence to sustain it—the jury, if they

obeyed the instructions, must necessarily find defendant guilty. We go further and say, if defendant had asked instructions on the law of 'self-defense', they should have been refused, because there was no evidence on which to predicate them. But the question here is not whether the defense of excusable homicide was made out. There was evidence in support of it, and the court should have instructed upon the law applicable to it."

Where one resisting an assault uses force not greatly disproportionate to the character of the assault, or uses a weapon from the use of which death would not ordinarily or naturally result, and through accident, or without due caution or circumspection, kills his assailant, he is not guilty of murder. Furthermore, the instruction given upon voluntary manslaughter did not properly define that offense.

Counsel for the people concede that the defendant did not testify, in substance, or to the effect, as stated by the court to the jury, and that the instruction of the court in that regard was purely an assumption upon its part. The instruction, when considered in connection with the defense relied upon by Wiley, was extremely prejudicial.

We can discern no distinguishing features in principle between this case and that of *Nilan v. The People, supra*. The judgment is, therefore, reversed, and the cause remanded.          *Judgment Reversed.*

Mr. JUSTICE MUSSER and Mr. JUSTICE HILL concur.