[No. 8129.]

## JABICH v. THE PEOPLE.

1. CRIMINAL LAW—*Change of Venue.* Information for. wilful murder. More than 90 percent of the population of the county subject to jury duty resided in, and in the vicinity of, the mining town in which the homicide was committed. There was a strong prejudice in that community against men of the nativity of the accused. Immediately after the homicide a mob pursued the accused, threatening to lynch him, and the sheriff had thought it necessary to remove him to another county for safe keeping. Newspapers had published untruthful and inflammatory accounts, highly prejudicial to the accused *Held* that a change of the venue should, in the exercise of a sound discretion, have been allowed. (178)

2. ——*Renewal of Motion, after Conviction Reversed,* must be upon a new showing, of the conditions then existing. (178)·

3. ——*Homicide by Mis-adventure—Elements.* .*To establish this* defense it must appear (1) That the accused was engaged in a lawful act. (2) That he was not guilty of any want of due care in the act causing the death. (3) That the homicide was accidental and not intentional. (179)

4. ——*Instructions.* No matter how unreasonable or improbable the defense asserted, the accused is entitled to an appropriate instruction upon the hypothesis that it may be true. (179)

Where, upon the trial of an information for murder the defense is that the accused was lawfully defending himself against an assault, and during the encounter the deceased was accidentally killed, the court should instruct upon the law of self-defense in connection with the law defining death by misadventure, because the question whether the accused was lawfully exercising the right of self-defense is involved in the defense of homicide by accident. *Nilan v. People* 27 Colo. 206 explained. (179, 181)

5. ——*Forms of Verdict—Duty of Counsel.* By custom and usage in this jurisdiction, it is the practice of the court of its own motion to have prepared and sent out to the jury, forms covering every possible verdict that may be returned. In a trial of an information for wilful murder, where counsel was, or should, by proper attention, have been aware of an omission to send to the jury a form of verdict covering manslaughter, and failed to request such a form, a conviction of first degree murder will not be reversed on this ground.* (182)

6. ——Homicide—Implied Malice—For the Jury. In the trial of an information for murder the jury should not be instructed that where no considerable provocation appears or the circumstances show an abandoned and malignant heart the law implies malice, and it is not necessary that they should determine the question. The court should direct the attention of the jury to the statute (Rev. Stat. Sec. 1624), and they should be left to draw the inference of malice. (181)

*Syllabus by GARRIGUES, J.

*Error to Lake District Court.*—Hon. CHARLES CAVENDER, Judge.

Mr. JAMES T. HOGAN, for plaintiff in error.

Hon. FRED FARRAR, Attorney General and Mr. CLEMENT F. CROWLEY, Assistant Attorney General, for The People.

Mr. JUSTICE GARRIGUES delivered the opinion of the court:

June 11, 1913, plaintiff in error was convicted of murder of the first degree for killing James Cleary on February 27, 1913. They were miners, and the homicide occurred in the shafthouse of a mine at Leadville, death resulting from two wounds inflicted with a miner's candle-stick, one on the breast, the other in the back. Prior to his employment at the mine, defendant had purchased a candle-stick on which he filed his initial and before the killing had traded it to one Lute Kellog. The morning of the homicide, the men met, friendly, with other miners in the dry-room, preparatory to going down the shaft. Some conversation occurred between deceased and defendant, at the time, in which each claimed a candle-stick, and defendant told deceased if he would go with him, he would show him the candle-stick in

question, upon which would be found his initial.  Both
went from the dry-room to the shaft to go down the mine.
While they were standing at the collar of the shaft wait-
ing for the cage, Lute Kellog came by, was informed of
the dispute, and on being asked to let deceased examine
the candle-stick, handed it to him, entered the cage and
went down, leaving them at the surface.  As soon as de-
ceased obtained possession of the candle-stick, he claimed
it was his; defendant also claimed it, calling Cleary's
attention to the initial.  At this time deceased attempted
to pass the candle-stick to his partner, who had appeared
on the scene, whereupon defendant pulled it out of de-
ceased's hand, and turned around to go down the shaft,
when deceased struck him a blow with his fist back of
and below the ear, which knocked him down and against
the cross bar of the shaft.  From the people's evidence
it appears that deceased was holding the candle-stick by
the sharp end, and defendant pulled it out of his hand
and turned facing the shaft; that deceased then struck
him in the back of the head with his fist and knocked
him over onto the cross-bar, and he would have fallen
down the shaft had it not been for this bar; that when
defendant got up, they grappled, a struggle ensued, and
defendant stabbed deceased in the back with the candle-
stick after he had declined further combat, and was re-
treating.  From defendant's evidence it appears that
after he had been knocked down against the cross-bar,
he arose in a dazed condition, when he was struck in the
back by some person which caused him to fall against
deceased; that they then clenched and struggled in this
position until defendant broke loose and ran away.  As
to what happened during and immediately after the af-
fray, the evidence is conflicting.

Defendant was from southeastern Europe, while de-
ceased and his friends were from northern Europe.  De-

fendant testified that during the encounter the friends of deceased showed hostility towards him, in both words and actions, and that he feared they would kill him and throw him down the shaft; that he participated in the struggle after being knocked down, in self-defense, and broke loose and ran away from fear of being killed, without any knowledge that deceased was wounded, and, if he stabbed him with the candle-stick, it was unintentional and without his knowledge.

1. The defendant filed an application for a change of venue, which the court overruled. From the evidence in support of this application, it appears that over ninety per cent of the population of Lake county, subject to jury duty, reside in and immediately around Leadville, and that the newspapers there published articles which were untruthful, inflammable, and highly prejudicial to the defendant who was a Montenegrin, and practically alone. The evidence shows there was in the camp at the time, strong prejudice against laborers from southeastern Europe. Excitement ran so high after the killing that defendant was pursued by a mob which threatened to lynch him, and he was removed by the sheriff to Chaffee county for safe keeping. The case was tried shortly after the homicide, and from the record we feel that the court in the exercise of its sound discretion should have changed the venue in order to insure a fair and impartial trial. Such conditions may not be present at the time of another hearing, if one be had, and we do not wish to be understood to hold that the court should grant a change of venue upon the showing now under consideration. Should the motion be renewed, it would have to be determined upon existing, and not past conditions.

2. The court refused to give any instructions regarding the law of self-defense for the reason, as it appears, that such defense admits the killing was inten-

tional, but that it was necessary in order to save the life of defendant, or prevent his receiving great bodily harm, and in as much as this defense was not interposed, it would be improper to instruct upon the law applicable thereto, there being nothing in the case calling for it, or upon which to predicate such an instruction; that under the doctrine announced in *Nilan v. People*, 27 Colo. 206, 60 Pac. 485, and *Wiley v. People*, 51 Colo. 574, 119 Pac. 620, it would be error to submit to the jury the law of self-defense. This is not the question. Self-defense was not interposed as a defense. The proposition is, was there any principle involved in the case calling for an appropriate instruction upon the law of self-defense, not as a defense, but upon the theory that defendant was engaged in doing a lawful act; if there is, it was error to refuse to give such an instruction. The theory of the defendant was, that he was standing with a miner's candle-stick in his hand, in a place where he had a right to be, with no thought or intention of injuring anyone; that he was assaulted and while defending himself, he may have accidentally stuck deceased with it, but that if he did, he had no knowledge of doing so. No matter how improbable or unreasonable the contention, defendant was entitled to an appropriate instruction upon the hypothesis that it might be true. Excusable homicide by misadventure, not self-defense, was the theory upon which defendant relied. Three elements enter into this defense, it must appear first, that the person killing, was engaged in a lawful act; second, that he was free from carelessness; and third, that he did not intend to, but accidentally killed another. If any of these is lacking, the plea is unavailing. For the purpose of showing he was engaged in the lawful act of self-defense, defendant claims he had been assaulted. If the homicide occurred while he was engaged in an unlawful act, misad-

venture is eliminated as a defense. As his right to assert the defense of misadventure depended upon his being engaged in a lawful act, so whether he was engaged in a lawful act or not, depended upon the principles of self-defense. If there was an encounter in which there was no claim that the killing was done in self-defense, and no such defense was interposed, but defendant claimed he was assaulted and was lawfully defending himself, and during the encounter the deceased was accidentally killed, the court should have instructed in connection with the law of misadventure, upon the law of self-defense; not because it was interposed and relied upon as a defense, but to aid the jury in determining whether the killing was accidental while defendant was engaged in doing a lawful act. In determining this question the principles of self-defense were involved.—*Ryan v. State,* 115 Wis. 488, 92 N. W. 271; *Prinder v. State,* 27 Fla. 370, 8 So. 837, 26 Am. St. 75.

We think the court misconceived the doctrine intended to be announced in the Nilan case. It holds that the true character of the defense presented should be submitted to the jury, and no instructions should be given based on a defense not interposed; that where no defense is predicated on self defense, there is no need of submitting it as a defense, and in some cases it might be prejudicial error to do so. It is evident from the entire opinion in the Nilan case that the statement: "We go further and say if defendant had asked instructions on the law of 'self-defense,' they should have been refused, because there was no evidence on which to predicate them." (27 Colo., 211), means if instructions had been asked upon the law of self-defense, as a defense, they should have been refused for the reason there was no evidence upon which to predicate such instructions. But it does not follow where defendant claims he

rightfully had possession of a miner's candle-stick; was standing where he had a right to be; was assaulted, knocked down, and in the struggle following while he was in a dazed condition and defending himself may have accidentally stuck his assailant with the candle-stick, causing death, but with no intention of doing so, and did not know when or how the injury was inflicted; that the court should refuse, in connection with an instruction on misadventure, to give an appropriate instruction upon the principles of self-defense, not because such a defense was relied upon, but for the purpose of enabling the jury to determine whether the defendant was doing a lawful act.

3. The court instructed the jury: "In certain cases however, the law implies malice as when no considerable provocation appears, or when all circumstances of the killing show an abandoned and malignant heart. If, therefore, you find from the evidence in this case that there was no considerable provocation at the time of the killing, or that the defendant acted with an abandoned and malignant heart, then in that event the law will imply malice and it will not be necessary for you to determine the question of malice." That part of the instruction telling the jury that in certain cases the law will imply malice and they need not determine that question, is wrong, and should have been omitted. True, the statute provides in what cases malice shall be implied, but the court should call the jury's attention to the statute and they should make the implication. Instead of telling them that in certain cases malice is a question of law and it will not be necessary for them to determine it, they should be told in what cases the statute says malice shall be implied, and left to make or draw the inference of malice for themselves as a logical deduction from the evidence.—*Kent v. People,* 8 Colo. 563, 9 Pac. 852.

4. The court, to aid the jury after they arrived at a verdict, of its own motion sent with them into the jury room all possible forms of verdict which they could return, excepting for manslaughter, which was omitted. Complaint is made that this was an intimation from the court that it had eliminated manslaughter from the case. One of the issues was whether the killing was by misadventure or felonious, and if felonious whether there was sufficient provocation or mitigation to reduce the killing to manslaughter, and appropriate forms of verdict on this issue should have been furnished the jury. By custom and usage in this jurisdiction, it is the practice for the court of its own motion to prepare or have prepared and submitted to the jury proper forms upon every possible verdict that might be returned. There was evidence of the people that the killing occurred during an affray, and had the defendant introduced no evidence, it was the duty of the court to have submitted verdicts upon manslaughter, on the theory that the jury could and might return such a verdict. Counsel for the defendant, had he properly watched the progress of the trial, must have known that no such verdict was sent to the jury room, and it was his duty to request the court to submit such a form. But because counsel for defendant did not request it, and because the jury found the defendant guilty of a grade higher than the grade above manslaughter, we are not prepared to reverse and remand the case on this account. Upon another trial the court should see that proper forms of verdict are furnished the jury.

5. The court told the jury that murder of the second degree means the *wrongful* killing of a human being with malice, but without deliberation and premeditation. Complaint is made of the use of the word "wrongful" instead of "unlawful." Unlawful as used in the statutory definition of murder, means without legal excuse or

just cause; that is, without justification or excuse. In this sense, it is not equivalent to wrongful. That the killing was without excuse or justification, that is, unlawful, carries with it a moral turpitude not conveyed by the word wrongful, which, in its ordinary sense means injurious, heedless, reckless, unjust unfair. Murder under our statute, as at common law, is defined as the unlawful killing of a human being with malice, and it is better in giving instructions not to experiment by substituting the word wrongful.

The case is reversed and remanded.

*Reversed.*

Decision *en banc.*