The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 22, 2018

**2018COA37**

**No. 15CA0654, People v. Wakefield — Criminal Law — Jury Instructions — Defenses — Defense of Person**

A division of the court of appeals considers whether a trial court must give a self-defense instruction where a defendant testifies that a gun discharged accidentally, killing the victim, but there is also evidence that the shooting was in self-defense. The division concludes that the trial court must give the self-defense instruction in that circumstance.

In so concluding, the division harmonizes potentially conflicting case law from the Colorado Supreme Court in *People v. Naranjo*, 2017 CO 87; *Brown v. People*, 239 P.3d 764 (Colo. 2010); *People v. Garcia*, 826 P.2d 1259 (Colo. 1992); *Idrogo v. People*, 818 P.2d 752 (Colo. 1991); *Vigil v. People*, 143 Colo. 328, 353 P.2d 82

(1960); *Huffman v. People*, 96 Colo. 80, 39 P.2d 788 (1934); and *Jabich v. People*, 58 Colo. 175, 143 P. 1092 (1914).

Article II, section 3 of the Colorado Constitution recognizes the right of a person to act in self-defense, and under binding case law, when a defendant presents at least a scintilla of evidence in support of a self-defense instruction, the court must instruct the jury on self-defense. Defendant's claim of accident in the course of self-defense was not so inconsistent as to deprive him of the right to have the jury instructed on self-defense.

The division also concludes that statements made by defendant to a private security guard and the police were admissible under *Miranda v. Arizona*, 384 U.S. 436 (1966), but the trial court was required to conduct a distinct due process analysis of whether the statements to the police were voluntary. Finally, photos of marijuana in defendant's apartment should not have been admitted at trial because they posed a danger of unfair prejudice that outweighed their probative value.

The conviction is reversed, and the case is remanded for a new trial.

Court of Appeals No. 15CA0654
City and County of Denver District Court No. 14CR1513
Honorable Edward D. Bronfin, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Timothy Wakefield,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE TERRY
Harris, J., concurs
Bernard, J., concurs in part and dissents in part

Announced March 22, 2018

Cynthia H. Coffman, Attorney General, Majid Yazdi, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Haddon, Morgan & Foreman, P.C., Norman R. Mueller, Rachel A. Bellis, Denver, Colorado, for Defendant-Appellant

¶ 1     When there is evidence in a murder case indicating that the defendant shot the victim either accidentally or in self-defense, is the trial court required to grant his request for a self-defense instruction?  Under the facts of this case, we answer "yes" to this question.  In our analysis, we harmonize potentially conflicting case law from our supreme court in *People v. Naranjo*, 2017 CO 87; *Brown v. People*, 239 P.3d 764 (Colo. 2010); *People v. Garcia*, 826 P.2d 1259 (Colo. 1992); *Idrogo v. People*, 818 P.2d 752 (Colo. 1991); *Vigil v. People*, 143 Colo. 328, 353 P.2d 82 (1960); *Huffman v. People*, 96 Colo. 80, 39 P.2d 788 (1934); and *Jabich v. People*, 58 Colo. 175, 143 P. 1092 (1914).

¶ 2     Defendant, Timothy Wakefield, appeals his judgment of conviction for second degree murder.  We reverse and remand for a new trial.

## I.  Background

¶ 3     Defendant was convicted based on an altercation during which he was holding a gun that discharged, causing the victim's death.

¶ 4     Defendant and the victim were longtime friends, and the victim was visiting defendant from out of state.  But in the hours leading up to the shooting, the victim and defendant argued and

were involved in a series of increasingly violent physical fights, during one of which defendant lost consciousness.

¶ 5 There was no dispute that defendant was holding a shotgun when the victim was killed. Just after the shooting, defendant indicated to two people that he had acted in self-defense. But defendant testified at trial that when the victim stepped forward and reached for the gun, defendant pulled the gun up and away from the victim's reach, and the gun "went off." According to defendant, he thought that the victim "was going to take the gun and hurt [him] with it." Defendant maintained that he did not intend to shoot or hurt the victim.

¶ 6 Defendant was tried for first degree murder, but the jury instead convicted him of the lesser included offense of second degree murder.

## II. Self-Defense Instruction

¶ 7 Defendant first argues that the trial court erred by declining to give his tendered jury instruction on self-defense. Because we agree, we reverse the conviction and remand for a new trial.

## A. Legal Standards

¶ 8 We review de novo whether there is sufficient evidence to support giving a defendant's requested self-defense jury instruction. *People v. Newell*, 2017 COA 27, ¶ 19. "When considering whether a defendant is entitled to [a] requested instruction[], we consider the evidence in the light most favorable to the defendant." *Cassels v. People*, 92 P.3d 951, 955 (Colo. 2004). The court's rejection of a defendant's tendered jury instruction is reviewed for constitutional harmless error. *See Neder v. United States*, 527 U.S. 1, 8-15 (1999); *Griego v. People*, 19 P.3d 1, 8 (Colo. 2001).

¶ 9 Generally speaking, there are two types of defenses to a criminal charge. *People v. Pickering*, 276 P.3d 553, 555 (Colo. 2011). First, there are affirmative defenses, which seek to justify, excuse, or mitigate the commission of the act. *Id.* Second, there are traverses, or element-negating defenses, which "effectively refute the possibility that the defendant committed the charged act by negating an element of the act." *Id.*

¶ 10 Self-defense can be either an affirmative defense or an element-negating defense depending on the grade of homicide charged. When the charged offense requires intent, knowledge, or

willfulness, as second degree murder does, *see* § 18-3-103(1), C.R.S. 2017, self-defense is an affirmative defense, *Pickering*, 276 P.3d at 555. "[I]t is possible for a person to knowingly cause the death of another, thus satisfying the basic elements of second-degree murder under section 18-3-103(1), but to nevertheless do so in self-defense as defined under section 18-1-704, [C.R.S. 2017,] and therefore not be guilty of second-degree murder." *Pickering*, 276 P.3d at 556.

¶ 11    "In Colorado, if presented evidence raises the issue of an affirmative defense, the affirmative defense effectively becomes an additional element, and the trial court must instruct the jury that the prosecution bears the burden of proving beyond a reasonable doubt that the affirmative defense is inapplicable." *Id.* at 555.

¶ 12    The supreme court has "consistently held that where the record contains any evidence tending to establish the defense of self-defense, the defendant is entitled to have the jury properly instructed with respect to that defense." *Idrogo*, 818 P.2d at 754; *see also People v. Saavedra-Rodriguez*, 971 P.2d 223, 228 (Colo. 1998) (quantum of evidence necessary for giving affirmative defense instruction is "a scintilla of evidence, or some evidence"). The

evidence to support such an instruction may come from any source, and may even consist of "highly improbable testimony by the defendant." *People v. Garcia,* 28 P.3d 340, 347 (Colo. 2001); *Newell,* ¶¶ 21-22.

## B. Discussion

### 1. Preservation

¶ 13    We start by rejecting the prosecution's contention that this issue is unpreserved and is therefore subject only to plain error review. Defense counsel preserved the issue by tendering an affirmative defense jury instruction for "deadly physical force in defense of person" as to the first degree and second degree murder charges. When tendering the self-defense instruction, counsel argued that there was sufficient evidence to support such an instruction, and that even if such evidence contradicted defendant's simultaneous claim that the shooting was accidental, he still had the right to a self-defense instruction. The court rejected the instruction, reasoning that defendant's testimony that he did not intend to pull the trigger was incompatible with the giving of an affirmative defense instruction for self-defense. We conclude that counsel's tendering of the instruction was sufficient to preserve the

issue for appeal. *See Newell,* ¶ 19 ("Because defendant requested the instruction, any error in failing to give the instruction requires reversal unless the error did not affect defendant's substantial rights.").

## 2. The Self-Defense Statute

¶ 14    Defendant was convicted of second degree murder, which is defined as "knowingly caus[ing] the death of a person." § 18-3-103(1). Self-defense is an affirmative defense to second degree murder. *Pickering,* 276 P.3d at 555-56.

¶ 15    Colorado's self-defense statute, section 18-1-704(1), provides:

> [A] person is justified in using physical force upon another person in order to defend himself . . . from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose.

The statute clarifies that "[d]eadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate and . . . [t]he actor has reasonable ground to believe, and does believe, that he . . . is in imminent danger of being killed or of receiving great bodily injury." § 18-1-704(2)(a).

### 3. Evidence Supporting Self-Defense Instruction

¶ 16     Viewing the evidence in the light most favorable to defendant for this purpose, *see Cassels*, 92 P.3d at 955, we conclude that there was at least a scintilla of evidence presented that would support a self-defense instruction, *see Saavedra-Rodriguez*, 971 P.2d at 228. That evidence included the following testimony of defendant and others:

- Several hours before the shooting, the victim and defendant were wrestling, and the victim put defendant in a headlock, during which defendant could not breathe. A witness said that defendant turned "red" while in the headlock.

- Later that day, after an evening of drinking, the two got into an altercation in defendant's apartment during which defendant accused the victim of stealing defendant's pants, containing about $1800 in cash. The victim swung at defendant and dragged him into the kitchen by his neck. With his arms around defendant's neck, the victim bent defendant over the stove. Defendant fought back, but ultimately they landed on the

floor, with the victim's hands still around defendant's neck, causing him to lose consciousness.

- Defendant later woke up in significant pain and ordered the victim to leave. The victim threatened defendant that he should "go back to sleep or I'll put you to sleep." Another struggle ensued during which the two landed on the living room television stand, breaking it.

- Defendant then retrieved his shotgun, at which time he felt "scared" and "helpless" because his brother and his dog were not around to protect him and help get the victim out of his apartment. Defendant "wanted the gun to stand between [the victim] and [himself to keep the victim] from fighting and hurting [defendant] physically any more."

- Though the victim initially left when confronted with the gun, he returned, pounding on the door and demanding access to look for his cell phone. The victim pushed his way back into the apartment, but left again when defendant threatened to call the police.

8

- When defendant found the victim's phone shortly thereafter, defendant ran out of the apartment, gun in hand, to return the phone to him. From ten feet away, defendant tossed the victim the phone, and the victim walked toward defendant.

- The victim then said, "Give me that gun. Fight me like a man. Let's fight like men." The victim moved toward defendant and reached for the gun. Defendant testified that he thought the victim was "going to take the gun and hurt me with it." He also testified that he "didn't expect the gun to go off." Defendant pulled back and the gun discharged.

- A private security guard who arrived on the scene just after the shooting testified that defendant told him that he had been robbed and that "it was self-defense" (apparently referencing defendant's situation).

- A police detective testified that, after the shooting, the detective handcuffed defendant, at which point defendant said, "Is this normal for this kind of case[,] being handcuffed for self-defense[?]"

## 4. Application of Self-Defense Law to the Facts

¶ 17    The trial court concluded that defendant's testimony that he had pulled the gun "up and away," combined with the lack of evidence that defendant intended to pull the trigger, negated the availability of self-defense as a defense to the charges. According to the court, this was not "a situation where the defendant has admitted the commission of the elements of the charged act but seeks to justify, excuse, or mitigate the commission of that act." The court relied on the 1992 *Garcia* case in rejecting the instruction. In that case, the supreme court held that the defendant could not claim that an intruder had stabbed the victim "and at the same time obtain an instruction based on the theory that [the defendant] stabbed [the victim] in the heat of passion." 826 P.2d at 1263-64.

¶ 18    We conclude that the trial court erred in its ruling by not following applicable supreme court precedents from *Idrogo*, *Saavedra-Rodriguez, Vigil, Huffman*, and *Jabich*.

¶ 19    In *Idrogo*, the court held that if there is *any* evidence in the record tending to establish self-defense, the court must instruct the jury on that defense. 818 P.2d at 754; *see also Saavedra-Rodriguez*

10

971 P.2d at 228 (mere "scintilla of evidence, or some evidence" supports giving a theory of defense instruction).

¶ 20     There was a sufficient legal basis and at least a scintilla of evidence that would have allowed the jury to credit defendant's claim of self-defense. Given the previous fighting between the victim and defendant, the latter could have rationally perceived that he needed to be armed so that he could protect himself from the victim. Defendant's testimony indicated that the threat to him from the victim was continuing. And his statements to the detective and the security guard indicating that "it was self-defense" could have prompted a properly instructed jury to acquit him based on a self-defense theory. The fact that he also claimed an accidental shooting was, under the circumstances he described, not so inconsistent with self-defense as to deprive him of the right to have the jury instructed on self-defense.

¶ 21     The trial evidence could have allowed the jury to rationally find that defendant either shot the victim accidentally or that the gun discharged as a result of his holding it in self-defense, and either theory could have properly resulted in an acquittal.

¶ 22     We find support for this view in *Vigil*, 143 Colo. at 334, 353

P.2d at 85.  There, the defendant claimed that a gun he was holding

to defend himself against the victim accidentally discharged and

killed the victim.  The supreme court held that the trial court

should have granted his request for a self-defense instruction,

stating that "[t]he *right* of self-defense is a natural right and is

based on the natural law of self-preservation."  *Id.*  The supreme

court observed that where a situation begins with an argument, but

escalates to the point where a person is "subjected to or threatened

with, such physical violence that he might have to resort to

justifiable homicide to protect his person," he is not "deprive[d] . . .

of the right of self-defense."  *Id.*; *see also Huffman*, 96 Colo. at 83-

84, 39 P.2d at 789-90 (Where the defendant asserted "three kindred

theories of defense: Accident, self-defense, and a mental condition

resulting from the blows upon his head during the encounter" with

the shooting victim, it was reversible error for the court to decline to

instruct the jury on these theories.); *Jabich*, 58 Colo. at 179, 143 P.

at 1094 (The trial court should have instructed the jury on self-

defense where the defendant asserted that he may have accidentally

caused the victim's death, ruling that, "[n]o matter how improbable

or unreasonable the contention, [the] defendant was entitled to an appropriate instruction upon the hypothesis that it might be true.").

¶ 23     In ruling that the self-defense instruction would not be given here, the trial court said, "[T]he basis for my decision [not to give the instruction] is [that defendant] affirmatively has testified that he pulled the firearm up and away and the gun discharged."  The court noted that the referenced testimony — combined with the lack of evidence that defendant either intended to pull the trigger or thought that it was necessary to pull the trigger to defend himself — negated the availability of self-defense as a defense to the charges.

¶ 24     The trial court's ruling did not give adequate deference to defendant's constitutional right to assert that he was acting in self-defense, and to have the jury instructed accordingly.  *See* Colo. Const. art. II, § 3 (recognizing inalienable right of persons to defend their lives); *Idrogo*, 818 P.2d at 754 (where any evidence tends to establish defense of self-defense, court must instruct jury with respect to that defense).

¶ 25     The holding of the 1992 *Garcia* case does not persuade us to adopt the People's theory that defendant is prevented by judicial

estoppel from asserting inconsistent theories of self-defense and accident.

¶ 26 Most importantly, that case was not a self-defense case, and it did not implicate the right of a person to defend his or her life that is established by article II, section 3 of the Colorado Constitution.

¶ 27 And unlike in that case, the basis for the instruction here did not depend on rejection of defendant's version of events in sworn testimony. *Cf.* 826 P.2d at 1263 (holding that the defendant could not back away from a binding judicial admission and rely on "a statement that he has, under oath, declared to be false in order to obtain" the requested alternative instruction).

¶ 28 This case is more like *Brown*, 239 P.3d at 768-69, where the defendant was charged with attempted first degree murder and consistently maintained his innocence. Brown's defense counsel, who had not elicited any contrary testimony from the defendant, requested an instruction on attempted second degree murder — a lesser included offense that depended on a theory inconsistent with the defendant's claim of innocence. *Id.* at 768. The supreme court concluded that the trial court erred by declining to give the instruction. *Id.* at 769.

¶ 29    In so ruling, the supreme court distinguished the 1992 *Garcia* case, saying that the holding in the earlier case turned "not on the inconsistency of the requested instruction, but on the inconsistency of the defendant's sworn testimony." *Id.* at 768. The supreme court decided that under the circumstances of Brown's case, the principal policy arguments for denying the defendant his requested instruction — namely, "that allowing an inconsistent instruction would be contrary to 'honesty and good faith' and/or encourage perjury" — were "substantially mitigated." *Id.* at 768-69.

¶ 30    Here, the trial court viewed defendant's assertions of both self-defense and accident as inconsistent. But, as we will discuss, any logical inconsistency between these concepts did not necessarily involve perjury or reneging on a judicial admission, as in the 1992 *Garcia* case, and should not have been invoked to preclude defendant's right to assert self-defense.

¶ 31    Given the evidence admitted at defendant's trial, the jury could have found that he was holding the gun in self-defense but that it discharged accidentally. Much of the evidence supporting self-defense consisted of defendant's own testimony, and some of it was contradicted by other witnesses. But even "highly improbable

testimony by the defendant" may provide the scintilla of evidence necessary to support a self-defense instruction. *Garcia*, 28 P.3d at 347.

¶ 32    The supreme court's recent decision in *Naranjo* does not change our analysis. In that case, a defendant who was charged with felony menacing for pointing a gun at a fellow driver contended that the jury should have received a lesser nonincluded offense instruction for the crime of disorderly conduct. *Naranjo*, ¶ 1. Applying the logic of the 1992 *Garcia* case, 826 P.2d 1259, the court rejected that assertion. *Naranjo*, ¶ 28. It reasoned that the jury could not rationally acquit the defendant of menacing while simultaneously convicting him of disorderly conduct, because conviction of the latter would have required the handling of the gun "in a manner calculated to alarm," § 18-9-106(1)(f), C.R.S. 2017, a scenario that was contradicted by the defendant's testimony that he was only carefully putting his gun in the glove box. *Naranjo*, ¶ 27. The jury in that case could only convict the defendant of the lesser offense if it disbelieved his own contrary testimony, a situation disapproved by the court in the 1992 *Garcia* case. *Naranjo*, ¶ 28 (citing *Garcia*, 826 P.2d at 1263); *see also People v. York*, 897 P.2d

16

848, 850 (Colo. App. 1994) (concluding that where the defendant testified he was not present when the victim was stabbed, he was precluded from requesting jury instructions on heat of passion, defense of self, and defense of others).

¶ 33     Unlike *Naranjo*, this case does not involve the propriety of instructing a jury on a lesser nonincluded offense. Rather, it implicates defendant's constitutional right to an accurate instruction on his theory of defense, and his entitlement to have the jury determine the truth of that theory. *See People v. Tardif*, 2017 COA 136, ¶ 34.

¶ 34     A lesser nonincluded offense instruction must be given only if a "*rational evidentiary basis* exists to simultaneously acquit [a defendant] of the charged offense and convict him of the lesser offense," *Naranjo*, ¶ 15 (emphasis added). The far more significant right of a defendant to a self-defense instruction, on the other hand, is demonstrated by the low bar set for when it must be given: a mere scintilla of evidence. *See Saavedra-Rodriguez*, 971 P.2d at 228; *see also Garcia*, 28 P.3d at 347 (scintilla of evidence may consist "of highly improbable testimony by the defendant").

¶ 35    Also unlike in the 1992 *Garcia* case and *Naranjo* case, the availability of the requested instruction here did not depend for its validity on rejection of defendant's version of events in his own sworn testimony.  *See Naranjo*, ¶¶ 27-28; *Garcia*, 826 P.2d at 1263. *Vigil* indicates that a person can both hold a firearm in self-defense and still kill a victim accidentally, and that in such circumstances, the jury must be instructed on self-defense.  *See* 143 Colo. at 334, 353 P.2d at 85.

¶ 36    Where, as here, a defendant claiming both accident and self-defense has presented at least a scintilla of evidence supporting self-defense, the defendant is entitled to such an instruction.  There was at least some evidence indicating that defendant *acted* in self-defense, even though he maintains that the actual firing of the weapon was unintentional.

¶ 37    Requiring a defendant to concede intent so that he may obtain a self-defense instruction would relieve the prosecution of its burden of proving all of the elements of the crime, thus depriving the defendant of his constitutional right to a trial by jury.  *See Tardif*, ¶ 34.  Such a scenario would ensnare any defendant claiming an accidental shooting in the course of self-defense in a

catch-22.  He would either have to admit to pulling the trigger and seek a self-defense instruction, or abandon his right to assert self-defense, even though there was some evidence suggesting that his actions, including a possible accidental discharge of the gun, were in the course of self-defense.

¶ 38     A division of this court has recognized the need to instruct the jury on self-defense where a defendant has asserted a "hybrid" defense incorporating both accident and self-defense.  In *People v. Lee*, 30 P.3d 686, 690 (Colo. App. 2000), the defendant conceded "that the revised instruction adequately included the substance of his self-defense theory . . . , but assert[ed] that it failed to include his theory that the shooting was accidental."  The division concluded that, "[b]ecause the evidence presented support[ed] each theory to some extent, the trial court had an affirmative duty to instruct the jury on both aspects of the defense."  *Id.*  The division nevertheless determined that the trial court did not err because the instructions that were given there "adequately informed the jury that, to support a conviction for second degree murder, defendant's conduct causing the death of the victim could not have been unintended or accidental."  *Id.*

19

¶ 39 Here, we face the opposite problem, because the trial court refused to instruct the jury on self-defense. It should have so instructed the jury.

¶ 40 This case is similar to *People v. Brooks,* 474 N.E.2d 1287 (Ill. App. Ct. 1985), where the defendant testified that his shooting of the victim was accidental. Because the evidence there would have also supported a finding that the defendant was acting in self-defense when the gun was fired, the appellate court held that the trial court was required to instruct the jury on self-defense. *See id.* at 1290 ("The fact that the defendant may have denied any intention to commit the act is . . . irrelevant. And the courts have indicated that it is perfectly proper to charge the jury with inconsistent defenses so long as the facts and nature of the case support the feasibility of either.") (citations omitted); *see also State v. Miller,* 739 A.2d 1264, 1266 (Conn. App. Ct. 1999) ("[W]e reject the state's argument that the defendant must admit that he intended to kill the victim to assert the justification of self-defense. . . . '[T]o compel a defendant to admit guilt in order to invoke a defense effectively relieves the prosecution of proving his guilt beyond a reasonable doubt and frustrates the assertion of the

20

defense itself and undermines its policy.'" (quoting *State v. Folson,* 525 A.2d 126, 130 (Conn. App. Ct. 1987))); *State v. Wooten,* 498 S.W.2d 562, 563 (Mo. 1973) (where the defendant's evidence indicated that a gun went off while he and the deceased struggled for possession of it, the defendant was entitled to have the jury instructed on both self-defense and accidental homicide); *State v. McCaskill,* 387 S.E.2d 268, 269 (S.C. 1990) ("Where a defendant claims that he armed himself in self-defense, while also claiming that the actual shooting was accidental, this combination of events can 'place the shooting in the context of self-defense.'") (citation omitted).

¶ 41    Defendant's request for a self-defense instruction had to be honored because the evidence at trial would have allowed the jury to find *either* (1) that defendant killed the victim accidentally *or* (2) that there was an "imminent danger of [defendant] being killed or of receiving great bodily injury," § 18-1-704(1), (2)(a), that might have justified his acting in self-defense.

¶ 42    We recognize that the framework of the affirmative defense of self-defense is not wholly compatible with defendant's claim that the shotgun discharged unintentionally.  This is because an

21

affirmative defense "admit[s] the defendant's commission of the elements of the charged act, but seek[s] to justify, excuse, or mitigate the commission of the act," *People v. McClelland*, 2015 COA 1, ¶ 17. So by requesting a self-defense instruction, a defendant ordinarily would concede that he "knowingly cause[d] the death of a person," § 18-3-103(1), but would seek to justify it because he acted in self-defense. "[T]he affirmative defense effectively becomes an additional element, and the trial court must instruct the jury that the prosecution bears the burden of proving beyond a reasonable doubt that the affirmative defense is inapplicable." *Pickering*, 276 P.3d at 555.

¶ 43 While the jury would necessarily have to first find that defendant "knowingly" caused the victim's death in order to then look to the self-defense instruction to excuse defendant's actions, *see McClelland*, ¶ 17, this would not preclude defendant from also asserting a somewhat inconsistent theory of defense based on the unintentional discharge of the gun. *Cf. People v. Opana*, 2017 CO 56, ¶¶ 10, 14 (concluding that the term "deadly physical force," which is defined as "force, the intended, natural, and probable consequence of which is to produce death, and which does, in fact,

produce death," § 18-1-901(3)(d), C.R.S. 2017, as used in the self-defense statute, does not require the user of that force to have a subjective intent; instead "intended" conveys the notion of an objective likelihood that such a result will occur).

¶ 44    We conclude that the error in not giving the self-defense instruction warrants reversal of the conviction.  *See Idrogo*, 818 P.2d at 756 ("A trial court's failure to properly instruct a jury on the applicable law of self-defense deprives the defendant of the right to an acquittal on the ground of self-defense if the jury could have had a reasonable doubt as to whether the defendant acted in necessary self-defense."); *Newell*, ¶ 20 (if there is any evidence in the record to support a self-defense instruction, a court's refusal to give one deprives the accused of the constitutional right to trial by jury).

### III.  Issues that May Arise on Retrial

¶ 45    Because the following issues may arise on retrial, we address them.

### A.  Defendant's Statements While in Custody

¶ 46    Defendant argues that the trial court erred by declining to suppress statements he made to both a private security guard and the police following his apprehension.  He contends that the

statements were either involuntary or admitted in contravention of *Miranda v. Arizona*, 384 U.S. 436 (1966). While we conclude that the statements complied with *Miranda*, because the court did not make distinct findings as to whether the statements were involuntary, on retrial, the trial court must hold an evidentiary hearing to make such findings.

### 1. *Miranda*

¶ 47    *Miranda* protects a suspect's right against self-incrimination by prohibiting the introduction of statements procured by custodial interrogation, unless the police have first given an advisement of the suspect's rights. 384 U.S. at 444; *People v. Matheny*, 46 P.3d 453, 462 (Colo. 2002). *Miranda*'s safeguards apply to a statement only if (1) the suspect was in custody at the time the statement was made, *People v. Begay*, 2014 CO 41, ¶ 13; and (2) the statement was the product of an interrogation, *People v. Madrid*, 179 P.3d 1010, 1014 (Colo. 2008). The parties do not dispute that defendant was in custody and had not yet been advised of his *Miranda* rights when he made the contested statements.

¶ 48    A statement is in response to interrogation if the suspect was "subjected to either express questioning or its functional

equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).

Therefore, interrogation includes "any words or actions on the part

of the police . . . that the police should know are reasonably likely to

elicit an incriminating response." *Id.* at 301. We evaluate the

totality of the circumstances in determining whether an

interrogation occurred, focusing on

> whether the officer reasonably should have
> known that the officer's words or actions
> would cause the suspect to perceive that he or
> she was being interrogated, whether those
> words or actions were calculated to elicit
> incriminating statements, and whether in light
> of the interrogation environment the police
> compelled the incriminating statements.

*People v. Bonilla-Barraza*, 209 P.3d 1090, 1094 (Colo. 2009).

However, *Miranda* does not prohibit the use of a suspect's

"volunteered, non-compelled statements." *People v. Gonzales*, 987

P.2d 239, 241 (Colo. 1999); *see also People v. Wood*, 135 P.3d 744,

752 (Colo. 2006) ("A defendant's spontaneous utterances will not be

excluded where there is no interrogation.").

¶ 49    Whether a custodial interrogation occurred is a mixed

question of law and fact. *People v. Barraza*, 2013 CO 20, ¶ 15.

While we defer to the trial court's findings of historical fact and will

25

not overturn them if they are supported by the record, "we review de novo the legal question whether those facts, taken together, establish that custodial interrogation occurred." *Id.*

¶ 50    Our review of the statements that defendant made while in custody leads us to conclude that the trial court did not err in declining to suppress the statements under *Miranda* because they were (1) made to a private security guard and not subject to *Miranda*; (2) based on *Miranda*'s public safety exception; or (3) volunteered and therefore not the product on an interrogation.

a.  Statements to Private Security Guard

¶ 51    Immediately after the shooting, defendant was apprehended by a private security guard, who held defendant at gunpoint, ordered him to lie prone on the ground, and called 911.  The guard testified that defendant then made numerous statements.  Defendant asked about the safety and well-being of his dog, said that he had been robbed, and said that there was a person whom he had shot and that he had tried to help that person.  He also said that he had acted in self-defense.  During the 911 call, the guard relayed the address of the incident and defendant's last name to the operator.

After the operator requested defendant's date of birth, the guard got that information from defendant and relayed it to the operator.

¶ 52    *Miranda* generally does not "apply to evidence obtained by private parties or evidence resulting from the conduct of private parties," unless the private party was acting as an "agent[] of the police by virtue of their suggestion, order, request, or participation for purposes of criminal investigation," as indicated by a totality of the circumstances.  *People v. Lopez*, 946 P.2d 478, 481-82 (Colo. App. 1997).  As defendant concedes, the security guard was privately employed and did not work for the police.  Therefore, the security guard was a private party, and in general, any statements that defendant made to him were not subject to *Miranda*'s restrictions.  *See id.*

¶ 53    We conclude that the totality of the circumstances indicates that the security guard was not acting as an agent of the police "for purposes of criminal investigation."  *Id.*  The security guard was responding to an immediate public safety issue at the apartment complex, and even when relaying information to the 911 operator, he was not acting in furtherance of a criminal investigation, but was instead helping coordinate a response to an emergency

27

situation and ensuring that defendant did not leave the scene. *See People v. Chastain*, 733 P.2d 1206, 1214 (Colo. 1987) (Where a hospital security guard apprehended and interrogated the defendants, there was no *Miranda* violation because the guard "received no compensation or remuneration from any public agency, nor did [the guard] act at the direction of the [police]. The fact that [the guard] contacted police officers after he apprehended the [defendants] is not sufficient to make him an agent of the police department.").

¶ 54     We conclude that admission of defendant's statements to the security guard is not precluded by *Miranda*.

### b.  Statements to Police Officers

¶ 55     The court admitted the following statements made by defendant to police officers after his arrest:

- After an officer handcuffed him, defendant asked questions about his dog and commented that the victim had been "fucking with my dog."

- When asked if he was injured, defendant said "no," but later said that he had been "hit in the face."

- An officer repeatedly asked defendant if there was anyone else in the residence, a question that defendant initially ignored. Eventually, after the officer cursed at defendant, he answered the question, saying that he believed somebody else was in the house but he did not know the person. The officer testified that he asked this question due to his concern that there could have been other victims or suspects in the vicinity.

- Defendant mentioned to the officer that he had a "large dog."

- Following a protective sweep of the residence, the officers placed defendant in a patrol car, at which point defendant refused to answer questions about his name and date of birth, saying that he did not want to talk. However, a few minutes later, defendant said, "I just need somebody to talk to me." The officer did not ask him any more questions, but defendant asserted that an intruder came into his residence, that defendant was "only trying to defend himself," and that defendant "tried to save" the victim.

- During the booking process at the jail, defendant, in response to being told to put his hands behind his back for handcuffing, asked if it was "normal for this kind of case . . . [to be] handcuffed for self-defense."

¶ 56 We conclude that defendant's comments to the officers either were excluded from *Miranda*'s protections or were volunteered statements that were not the product of interrogation.

¶ 57 The public safety "exception to the *Miranda* rule permits custodial interrogation directed to obtaining information important to protect the safety of officers engaged in immediate, on-scene investigation of a crime." *People v. Requejo*, 919 P.2d 874, 879 (Colo. App. 1996). Defendant's answers to questions regarding the extent of his injuries and whether there was anyone else in the residence were not excluded by *Miranda* because the officers, having just arrived on the scene, had a legitimate concern that there could be other armed suspects or injured victims in the vicinity. The officers were justified in trying to determine whether defendant was severely injured or needed other medical attention. *See People v. Janis*, 2016 COA 69, ¶ 54 (*cert. granted on other grounds* Feb. 21, 2017).

¶ 58    The record supports the trial court's finding that defendant's other statements were volunteered and therefore did not warrant exclusion under *Miranda* as the product of interrogation. When these statements were made, there were not "any words or actions on the part of the police . . . that the police should [have known would be] reasonably likely to elicit an incriminating response," *Innis*, 446 U.S. at 301, and therefore the use of such "volunteered, non-compelled statements" was not prohibited by *Miranda*, *Gonzales*, 987 P.2d at 241.

¶ 59    The record indicates that defendant's repeated statements about his dog were spontaneous, as were his comments in the patrol car that he "just need[ed] somebody to talk to" him, "an intruder was trying to come into [his] residence," he "was only trying to defend" himself, and he "tried to save him" (apparently referencing the victim). When defendant made the statements in the patrol car, the officer had not spoken to him in a few minutes, and during the officer's earlier questioning of defendant, he had only asked questions about basic identifying information such as defendant's name and date of birth, which were not questions intended to elicit incriminating information about the shooting.

31

¶ 60    Consequently, the trial court did not err in declining to suppress defendant's statements to the police based on *Miranda*.

## 2. Voluntariness

¶ 61    While the trial court conducted a full analysis of whether defendant's statements were admissible under *Miranda*, it did not make the required, separate determination of whether his statements to the police warranted suppression because of defendant's assertion that the statements were involuntary. On remand, it must do this analysis.

¶ 62    Due process dictates that "a defendant's statements must be made voluntarily in order to be admissible into evidence," *Effland v. People*, 240 P.3d 868, 877 (Colo. 2010), meaning that the "evidence [must be] independently and freely secured without officials resorting to coercion," *People v. Zadran*, 2013 CO 69M, ¶ 9. Involuntary statements, whether inculpatory or exculpatory, are inadmissible for any purpose. *Effland*, 240 P.3d at 877; *People v. Humphrey*, 132 P.3d 352, 360 (Colo. 2006). Compliance with *Miranda* alone is not determinative of whether a statement was voluntarily given and therefore admissible. *Humphrey*, 132 P.3d at 360.

¶ 63    Coercive conduct is a predicate to a determination that a defendant's response is not voluntary, *id.*, and in evaluating whether a suspect's statements were involuntary, the court should consider the totality of the circumstances and weigh the varying factors endorsed by the supreme court in *People v. Medina,* 25 P.3d 1216, 1222 (Colo. 2001).

¶ 64    It is critical that a trial court make findings regarding voluntariness on the record, *People v. Gennings,* 808 P.2d 839, 844 (Colo. 1991), and "[w]here the trial court has failed to rule on the [issue of] voluntariness," the appellate court should remand for an evidentiary hearing on the issue, *Hunter v. People,* 655 P.2d 374, 376 (Colo. 1982).

¶ 65    Even though the court found that certain statements were "volunteered," and therefore not the product of police interrogation for *Miranda* purposes, it still was required to make separate findings as to whether the statements were voluntary in accordance with defendant's due process rights. *See Wood,* 135 P.3d at 748 ("Statements may be suppressed when the defendant does not make a statement voluntarily or when the statement is obtained in

violation of *Miranda.*  Although these inquiries are similar, they are distinct and independent grounds for suppression.").

¶ 66    A due process voluntariness inquiry is distinct from an inquiry into whether a defendant's statement was volunteered under *Miranda.*  Whether a statement was volunteered for purposes of a *Miranda* inquiry is closely related to the question of whether a statement was the product of an interrogation because there were "words or actions on the part of the police . . . that the police should [have known were] reasonably likely to elicit an incriminating response."  *Innis,* 446 U.S. at 300-01; *see also Wood,* 135 P.3d at 752 ("A defendant's spontaneous utterances will not be excluded [under *Miranda*] where there is no interrogation.").  A due process voluntariness analysis instead focuses on whether a statement was "the product of an essentially free and unconstrained choice by its maker" and was thus free from coercion.  *Effland,* 240 P.3d at 877 (quoting *People v. Raffaelli,* 647 P.2d 230, 234 (Colo. 1982)).  "The ultimate test of involuntariness is whether a defendant's will has been overborne."  *Wood,* 135 P.3d at 748.

¶ 67    On remand, the trial court must conduct an evidentiary hearing to determine whether defendant's statements to police

officers were voluntary. "The prosecution must establish by a preponderance of the evidence that the statements were made voluntarily under the totality of the circumstances before those statements may be admitted into evidence." *Humphrey*, 132 P.3d at 360; *see also Medina*, 25 P.3d at 1222. If they were not voluntary, they may not be admitted at trial.

¶ 68 But his statements to the security guard do not need to be reexamined, because they were made to a private party. Even "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 166 (1986). As a result, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Id.* at 167. Because the security guard was acting as a private person, the Due Process Clause did not apply to his behavior.

### B. Photos of Marijuana

¶ 69 Defendant argues that the trial court erred by admitting photographs showing a large amount of marijuana in his

apartment. We conclude that the court erred in admitting the photos, and that they should not be admitted on retrial.

### 1. Legal Standards

¶ 70      We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002). A court abuses its discretion when its ruling is (1) based on an erroneous understanding or application of the law or (2) manifestly arbitrary, unreasonable, or unfair. *People v. Esparza-Treto*, 282 P.3d 471, 480 (Colo. App. 2011).

¶ 71      Subject to certain exclusions, evidence is admissible if it is relevant, meaning that the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." CRE 401; *see* CRE 402.

¶ 72      Even if relevant, though, evidence is subject to exclusion under CRE 403 if its probative value is substantially outweighed by the danger of unfair prejudice. *See Yusem v. People*, 210 P.3d 458, 464-65 (Colo. 2009). When reviewing evidence under CRE 403, we must assign the evidence its maximum probative value and minimum unfair prejudice. *People v. Nuanez*, 973 P.2d 1260, 1263 (Colo. 1999).

## 2. Discussion

¶ 73    The court admitted the photos over defendant's objection. One photo showed several growing plants. The other showed a significant amount of what appear to be drying marijuana leaves. The court reasoned that the photos were relevant to defendant's credibility in reporting that he had been acting in self-defense because he had been robbed.

¶ 74    We reject the People's contention that the photos were admissible as res gestae evidence. Res gestae evidence is evidence that is "linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *People v. Quintana*, 882 P.2d 1366, 1373 (Colo. 1994) (quoting *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985)). There was no indication that the marijuana played any part in the events leading up to the shooting, and the photos therefore were not admissible as res gestae evidence.

¶ 75    We conclude that any arguably probative value the photos might have had was substantially outweighed by the danger of unfair prejudice from showing a large amount of marijuana, and

37

that they were subject to exclusion under CRE 403. The photos leave the impression that defendant may have been conducting a grow operation in the apartment, and they could have caused the jury to view him unfavorably.

¶ 76 Defendant never asserted that the victim had stolen any marijuana; instead he claimed that the victim had taken his pants, which he claimed had contained $1800 in cash. Contrary to the People's argument, the fact that some items of value were not stolen has no tendency to prove whether other valuable items might have been stolen.

¶ 77 Because the potential for unfair prejudice substantially outweighed the probative value of this evidence, it should have been excluded under CRE 403. On retrial, these photos should not be admitted into evidence.

## IV. An Issue Unlikely to Arise on Retrial

¶ 78 Defendant finally contends that the trial court committed plain error by failing to administer an oath or affirmation to the court interpreters as required by CRE 604. We decline to address this contention because it is unlikely to arise on retrial.

## V.  Conclusion

¶ 79    The judgment of conviction is reversed, and the case is remanded for a new trial.  On remand, as discussed in Part III.A, the court must conduct an evidentiary hearing on the voluntariness and ultimate admissibility of defendant's statements to the police officers, and, as discussed in Part III.B, photos depicting marijuana should be excluded from evidence.

JUDGE HARRIS concurs.

JUDGE BERNARD concurs in part and dissents in part.

JUDGE BERNARD, concurring in part and dissenting in part.

## I. Introduction

¶ 80    I respectfully dissent from the majority's conclusion in Part II that the trial court erred when it declined defendant's self-defense instruction.

¶ 81    I agree with the majority's analysis in Part III.A that, although the statements defendant attacks on appeal satisfied the requirements of *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), the trial court did not make adequate findings about whether the statements to the police officers were voluntary. So I would vacate defendant's conviction and remand the case to the trial court to determine whether those statements were voluntary. If the court were to then decide that they were voluntary, it would reinstate defendant's conviction for second degree murder. If the court were to decide that they were not, it would have to order a new trial.

¶ 82    I also agree that, on remand, the trial court should not evaluate whether defendant's statements to the private security guard were voluntary. As the majority points out, the security guard was acting as a private person, so the Due Process Clause did not apply to his behavior.

40

¶ 83    I likewise concur with the majority's conclusion in Part III.B that the trial court should not have admitted the photographs of the marijuana grow operation. But I conclude that this evidence was harmless because the evidence in this case was overwhelming. So there was not a "reasonable probability that the error contributed to . . . defendant's conviction." *Salcedo v. People*, 999 P.2d 833, 841 (Colo. 2000) (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

¶ 84    Last, I conclude that defendant waived his contention that the trial court erred when it did not swear in two interpreters. *See United States v. Perez*, 651 F.2d 268, 273 (5th Cir. 1981).

¶ 85    As a result of these various conclusions, I would, as indicated above, vacate defendant's conviction and remand the case so that the trial court could determine whether defendant's statements to the police officers were voluntary. I would otherwise affirm.

II.    Defendant Was Not Entitled to a Self-Defense Instruction

¶ 86    Defendant testified at trial that the shooting was an accident. But he made a different claim immediately after the shooting. According to the testimony of the private security guard who apprehended him right after the shooting, defendant said that "he

41

was being robbed and it was self-defense." And, when a police officer handcuffed him at police headquarters to transport him to jail, he asked, "Is this normal for this kind of case being handcuffed for self-defense[?]" In other words, he did not claim that the shooting was an accident shortly afterward; he said it was self-defense.

¶ 87　Defendant did not contest the accuracy of the security guard's and the police officer's testimony. In fact, trial counsel relied on it when he asked the court to instruct the jury about self-defense:

> I believe the jury could easily find and logically conclude that while [defendant] is *now* making a claim that his actions were an accident . . . his statements at the time that he acted in self-defense were the *real* reason that he *fired the gun* at [the victim] because he was acting in self-defense. . . . And when the jury is *free to disregard whatever evidence* they want and *give credence* to whatever they want, yes, there *is a set of circumstances* under which they could find that [defendant's] conduct constituted self-defense.

(Emphasis added.)

¶ 88　Trial counsel's request recognized that defendant's trial testimony and his statements to the two witnesses immediately after the shooting were inconsistent. The jury would have to (1)

42

"disregard" his trial testimony; and (2) "give credence" to "a set of circumstances," which was the statements that he made immediately after the shooting; to (3) find that he had acted in self-defense.

¶ 89    But defendant's contention is different on appeal: he asserts that, although he "armed himself in self-defense," "the actual shooting was accidental." In other words, he now submits that he had two intersecting and consistent defenses: accident and self-defense. But, as I have shown above, that was not his position at trial. Rather, based on his testimony, the testimony of the two witnesses to whom he spoke after the shooting, and trial counsel's statements about why the court should give a self-defense instruction, defendant provided inconsistent statements about one event: why the shotgun fired.

¶ 90    The difference between defendant's trial and appellate contentions has two effects, one minor and one major.

¶ 91    The minor effect has to do with the standard of review. Defendant's appellate contention was not preserved because a "request was made in the trial court on grounds different from [the one] raised on appeal." *People v. Gee,* 2015 COA 151, ¶ 45. So I

would review any error that the trial court may have made when rejecting defendant's request for a self-defense instruction to see if it was plain. *See, e.g., Hagos v. People*, 2012 CO 63, ¶ 14. But this effect matters little because I conclude that the court did not err at all.

¶ 92     The major effect has to do with the way in which defendant has recharacterized his position at trial. If the defenses were consistent, defendant might not be boxed in by *People v. Garcia*, 826 P.2d 1259, 1263 (Colo. 1992). But I think that defendant made it clear at trial that the defenses were inconsistent, so *Garcia* controls this case.

¶ 93     In *Garcia*, the defendant testified at trial that one of his statements to the police had been a lie. *Id.* In this statement, he admitted that he had stabbed the victim, although he claimed to have been very upset. *Id.* at 1261. This statement was the only evidence in the record that might have supported a heat-of-passion manslaughter instruction. *Id.* at 1262-63.

¶ 94     The defendant also testified at trial that he had not stabbed the victim; an intruder had. *Id.* at 1262. So his theory of defense

at trial was that he had not engaged in the conduct that had led to the victim's death.

¶ 95    The supreme court decided that the defendant's trial testimony that he had not stabbed the victim was a "binding judicial admission." *Id.* at 1263. As is pertinent to this discussion, a judicial admission is a "formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." *Kempter v. Hurd*, 713 P.2d 1274, 1279 (Colo. 1986). Judicial admissions bind the party that makes them. *Id.*

¶ 96    After citing these principles from *Kempter*, *Garcia* discussed how, in cases like this one, a defendant's trial testimony may become a binding judicial admission.

> [W]hen a party testifies to facts in regard to which he has special knowledge, such as his own motives, purposes, or knowledge or *his reasons for acting as he did*, the possibility that he may be honestly mistaken disappears. His testimony must be either true or deliberately false. To allow him to contradict his own testimony under these circumstances would not be "consistent with honesty and good faith." Whether his statements be true or false, he will be bound by them, and possible

45

> contradictions by other witnesses become immaterial. He will not be allowed to obtain a judgment based on a finding that he has perjured himself.

*Garcia,* 826 P.2d at 1263 (quoting *Harlow v. Laclair,* 136 A. 128, 130 (N.H. 1927)); *see also People v. York,* 897 P.2d 848, 850 (Colo. App. 1994) ("[A] defendant is not entitled to a theory-of-the-case jury instruction when he or she testifies under oath and utters binding judicial admissions which wholly contradict the tendered theory of defense instruction."); *cf. People v. Naranjo,* 2017 CO 87, ¶ 28.

¶ 97    In *Garcia,* the defendant's binding admission during his testimony had a significant effect. It led the supreme court to conclude that he could not "claim that an intruder stabbed [the victim] and at the same time obtain an instruction based on the theory that he stabbed [the victim] in the heat of passion." *Garcia,* 826 P.2d at 1263-64. The court reached this conclusion because "there was no evidence apart from the videotaped statement [to the police] to support a heat of passion manslaughter instruction. Manslaughter was not even [the defendant's] theory of defense." *Id.* at 1263.

¶ 98     I recognize that defendant did not, during his trial testimony, expressly disavow the two statements that he made immediately after the shooting.  In fact, he did not mention them.  So, unlike the defendant in *Garcia*, he did not expressly declare under oath that his references to self-defense were false.  *See id.*

¶ 99     But defendant disavowed the two statements just the same. By testifying that the shooting was an accident, he rejected the defense of self-defense, and he offered "his reasons for acting as he did."  *Id.* at 1263.  "His testimony [therefore] must [have been] either true or deliberately false . . . [and] he will be bound by [it] . . . ."  *Id.* And trial counsel, when discussing his request for a self-defense instruction, made clear that accident and self-defense were inconsistent defenses.  *See Kempter*, 713 P.2d at 1279.  I therefore conclude that defendant's trial testimony and trial counsel's statements to the court about the self-defense instruction combined to create a binding judicial admission.

¶ 100    Applying *Garcia*'s reasoning, in this case "there was no evidence [describing *why the shotgun fired*] apart from" defendant's two statements immediately after the shooting "to support a [self-defense] instruction."  *Garcia*, 826 P.2d at 1263.

47

¶ 101 And, as in *Garcia,* there was an inconsistency between defendant's binding judicial admission and the instruction for which he asked. In *Garcia,* the defendant testified that someone else committed the crime, but he wanted a heat-of-passion manslaughter instruction. In this case, defendant testified that the shooting was an accident, but he wanted a self-defense instruction.

¶ 102 *Brown v. People*, 239 P.3d 764, 768 (Colo. 2010), does not compel a different conclusion. In that case, the defendant "consistently maintained his innocence during the initial police investigation and afterward at trial." *Id.* The holding in *Brown* pivoted on that consistency: "[W]e hold that a criminal defendant who maintains his innocence may receive an inconsistent jury instruction on voluntary intoxication provided there is a rational basis for the instruction in the evidentiary record." *Id.* at 770. In other words, *Brown* held that the simple fact of maintaining innocence does not preclude asking for an instruction that may suggest guilt on a lesser offense.

¶ 103 But *Brown* did not involve a defendant's inconsistent statements, and this case does. Indeed, in *Brown,* "*[t]he jury would have considered inconsistent defenses, but [the defendant] would not*

48

*have necessarily testified untruthfully.*" *Id.* at 769 n.3 (quoting *Mathews v. United States*, 485 U.S. 58, 65 (1988)). In this case, by testifying that the shooting was an accident, defendant took self-defense off of the table. *Garcia*'s "rationale and thrust" was that "a defendant cannot testify under oath to certain facts" — in this case, accident — "that, by their nature, preclude any other defense" — in this case, self-defense — "and then seek a jury instruction based on contradictory evidence that would show his or her sworn testimony to be false." *York*, 897 P.2d at 850.

¶ 104    Last, I respectfully submit that *Vigil v. People*, 143 Colo. 328, 334, 353 P.2d 82, 85 (1960), and *Jabich v. People*, 58 Colo. 175, 178-81,143 P. 1092, 1093-94 (1914), are irrelevant to the analysis in this case. Those decisions did not involve an inconsistency, based on a defendant's binding judicial admission, between what the defendant said shortly after the crime and what he testified to at trial. It is my view that this case is controlled by such an inconsistency.