The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
February 21, 2019

## 2019COA21

**No. 15CA0576, *People v. Cooper* — Evidence — Relevancy and Its Limits — Irrelevant Evidence Inadmissible — Testimony by Experts**

In this criminal appeal, the division holds that the existence of an intimate relationship does not, by itself and without evidence of escalating abuse or violence, justify the admission of blind expert testimony on the cycle of violence or other attributes of an abusive relationship.  The majority concludes the admission of such evidence in this case, where there was no evidence presented that the defendant and victim had a history of domestic abuse or violence, was not harmless and reverses the defendant's conviction and remands for a new trial.

The partial dissent agrees that allowing the testimony of the domestic violence blind expert was an abuse of discretion because it

was irrelevant in this case.  Nonetheless, based on this record, the partial dissent would conclude that the expert's testimony was harmless and affirm the jury's verdict.

COLORADO COURT OF APPEALS                                   **2019COA21**

Court of Appeals No. 15CA0576
El Paso County District Court No. 13CR2453
Honorable Michael P. McHenry, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Kerry Lee Cooper,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE BERGER
Richman, J., concurs
Román, J., concurs in part and dissents in part

Announced February 21, 2019

Philip J. Weiser, Attorney General, Charlotte M. Powers, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Tracy C. Renner, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

## I. Introduction and Summary

¶ 1    The principal issue in this appeal of a criminal prosecution for menacing, assault, harassment, and cruelty to an animal, is the propriety of the admission of "blind" expert testimony regarding the dynamics of abusive intimate relationships.

¶ 2    A "blind" or "cold" expert knows little or nothing about the facts of a particular case, often has not met the victim, and has not performed any forensic or psychological examination of the victim (or the defendant). *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendments; *see also* Christopher Tarver Robertson, *Blind Expertise*, 85 N.Y.U. L. Rev. 174 (2010).[1]

¶ 3    Colorado courts repeatedly have recognized the value of blind expert testimony in appropriate cases. *Venalonzo v. People*, 2017 CO 9, ¶¶ 32-34; *People v. Wittrein*, 221 P.3d 1076, 1081 (Colo. 2009); *People v. Relaford*, 2016 COA 99, ¶¶ 26-30; *see also People v. Fortson*, 2018 COA 46M (Berger, J., specially concurring).  When

---

[1] Sometimes, blind experts are referred to as "general," as opposed to "case-specific," experts.  Victoria L. Lutz, *A Guide to Domestic Violence Expert Testimony in Colorado*, 45 Colo. Law. 63 (Nov. 2016) *as reprinted in* The Journal of American Judges Association, 53 Court Review 22, *available at* https://perma.cc/QSH6-UJL5.

the actions of a victim are counterintuitive to what an ordinary juror might expect, this type of expert testimony may be crucial in explaining to the jury what social science has learned about the behavior patterns of people who are involved in violent relationships. *Venalonzo*, ¶¶ 32-34. Without this testimony, jurors may well reach incorrect decisions because they do not have the background to understand such counterintuitive actions. *Relaford*, ¶ 30. Nothing in this opinion questions the admissibility of such testimony in the proper case.[2]

¶ 4 But, there are substantial risks attendant to the admission of blind expert testimony that cannot be ignored. When blind expert testimony is used to persuade the jury to make findings of historical fact that are not supported by evidence presented to the jury, the trial process is corrupted, and the defendant may, as a result, be deprived of a fair trial.[3]

---

[2] The General Assembly has recognized the cyclical nature of domestic violence relationships. § 18-6-801.5, C.R.S. 2018.

[3] Because the effect of the improper admission of the blind expert testimony on the defendant's right to a fair trial is the same, we need not, and therefore do not, determine whether the prosecutor had a good faith basis for presenting the blind expert testimony or, instead, acted in violation of the special duties imposed on a

¶ 5    We conclude that virtually all of the blind expert testimony presented in this case was wholly irrelevant to the issues properly before the jury.  We further conclude that the admission of this evidence was highly prejudicial.  Accordingly, we reverse the convictions and remand for a new trial.

## II.    Facts and Procedural History

¶ 6    Kerry Lee Cooper and L.K. were in an intimate relationship and living together at the time of the alleged assault.  In the early hours of a morning in the summer of 2013, L.K. woke up in a panic attack.  She felt like she could not breathe.  It was very hot in the room, so L.K. asked Cooper to plug in the nearby fan.  Cooper turned on the fan and placed it on the floor.  L.K. was unhappy with the positioning of the fan and the two began to argue.

¶ 7    According to L.K.'s testimony, Cooper then shoved the running fan into L.K.'s face, cutting her face with the blades.[4]  L.K. grabbed

---

prosecutor to seek justice, not just convictions.  *See* Colo. RPC 3.8 cmt. 1; *Domingo-Gomez v. People,* 125 P.3d 1043 (Colo. 2005) ("[A] prosecutor, while free to strike hard blows, is not at liberty to strike foul ones." (quoting *Wilson v. People,* 743 P.2d 415, 418 (Colo. 1987))).

[4] L.K.'s statements and testimony on this point were inconsistent.  In statements to police officers immediately after the incident, she

a flashlight from the nightstand and hit Cooper on the head with it. Cooper dropped the fan and began hitting L.K. in the face and ribs with his closed fist. L.K. crawled to the window and screamed for help. Cooper told L.K. to shut up and grabbed her by the jaw, inserting his fingers into her mouth. She bit one or more of his fingers. Cooper then grabbed a tire iron located just outside the bedroom and told L.K. to stop screaming or he would hit her with it. When she did not, he hit her twice with the tire iron.

¶ 8    Cooper testified that he did not punch L.K., grab her jaw, or pick up the tire iron and hit L.K. with it. According to him, L.K. asked him to reposition the fan, and, when she became unhappy with the way he had positioned it, he threw the fan on the end of the bed, at which point L.K. hit him with the flashlight and bit his hand when he attempted to take the flashlight away from her to

---

said that Cooper did not press the blades into her face. At trial, she testified that Cooper did so, causing substantial injuries. There were other inconsistencies in her testimony about the alleged assault, including Cooper's alleged use of a tire iron as a weapon.

protect himself.[5]  Cooper did not deny, however, that he pushed L.K in her forehead.

¶ 9     Cooper's daughter, who lived close by, heard the screaming and called the police.  Officers obtained statements from Cooper and L.K. and observed injuries on both of them.

¶ 10     At trial, over Cooper's repeated objections, the prosecution presented extensive testimony from an expert witness about (1) characteristics of domestic violence relationships; and (2) the "power and control wheel," a tool developed purportedly to explain the ways an abusive partner can use power and control to manipulate a relationship.

¶ 11     The jury acquitted Cooper of the menacing and cruelty to animal charges but convicted him of third degree assault and harassment.

### III.   Claimed Errors

¶ 12     On appeal, Cooper asserts that (1) the trial court erred in admitting the blind expert witness testimony both on reliability and

---

[5] Cooper generally denied the charges, but also pleaded the affirmative defense of self-defense.  The trial court instructed the jury on self-defense with respect to the third degree assault charge.

relevance grounds; (2) the prosecutor engaged in prosecutorial misconduct during closing argument; and (3) the court committed plain error when it did not give a special unanimity instruction on the assault charge.

¶ 13    We agree that the expert testimony was inadmissible because it was irrelevant and highly prejudicial; therefore, we reverse the convictions and remand for a new trial.  To provide guidance on remand, we reject Cooper's claim that he was entitled to a modified unanimity instruction.  We decline to address the alleged claims of prosecutorial misconduct because we do not know whether those statements will recur at the retrial.

## IV.    The Vast Bulk of the Blind Expert Testimony Was Irrelevant[6]

¶ 14    Only relevant evidence is admissible.  CRE 402.  Irrelevant evidence is not admissible.  *Id.*  The question here is whether expert

---

[6] Because we conclude that the expert testimony was irrelevant, it is unnecessary for us to address Cooper's claim that the trial court did not determine the reliability of the expert's opinions before allowing them to be presented to the jury.  Our disposition also obviates the necessity of addressing the Attorney General's objection to preservation of that issue.

If expert testimony is proffered at the retrial, the trial court must comply with the gatekeeper obligations imposed on trial courts by CRE 702 and the supreme court's opinion in *Ruibal v. People*, 2018 CO 98.

opinions regarding domestic violence had any relevance or "fit" to the facts that were presented to the jury at trial.

¶ 15    To illustrate our analysis, the chart that appears in the Appendix catalogues each opinion expressed by the expert witness and the historical evidence, if any, presented to the jury that had any relationship to the expressed opinion.

## A.    Standard of Review

¶ 16    We review a trial court's evidentiary ruling for an abuse of discretion. *People v. Welsh*, 80 P.3d 296, 304 (Colo. 2003). A trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair, *id.*, or if it misconstrues or misapplies the law, *People v. Glover*, 2015 COA 16, ¶ 10.

## B.    Admissibility of Expert Testimony

¶ 17    CRE 702 governs the admission of expert testimony. Exercising its gatekeeper function, the trial court must "focus on the reliability and relevance of the proffered evidence" and determine "(1) the reliability of the scientific principles, (2) the qualifications of the witness, . . . (3) the usefulness of the testimony to the jury," and (4) whether the evidence meets the test of CRE

403. *People v. Shreck*, 22 P.3d 68, 70 (Colo. 2001). Recently, the supreme court again explained the trial court's gatekeeper function:

> [T]he trial court's inquiry should be broad in nature and take into consideration the totality of the circumstances of each specific case, focusing on both the reliability and relevance of the evidence. In light of the wide range of factors that may be considered in any individual case and the liberal nature of the standard, we imposed upon trial courts admitting evidence pursuant to CRE 702 an obligation to first determine and make specific findings on the record, not only as to the reliability of the scientific principles upon which the expert testimony is based and the qualifications of the witness giving that testimony, but also the usefulness of such testimony to the jury, including specific findings with regard to the court's obligation pursuant to CRE 403 to ensure that the probative value of the evidence would not be substantially outweighed by any of the countervailing considerations enumerated in the rule.

*Ruibal v. People*, 2018 CO 93, ¶ 12 (citations omitted).

¶ 18    Expert testimony should be admitted only when the expert's opinions will be helpful to the fact finder. *People v. Valdez*, 183 P.3d 720, 723 (Colo. App. 2008). "Helpfulness to the jury hinges on whether the proffered testimony is relevant to the particular case: whether it 'fits.'" *People v. Martinez*, 74 P.3d 316, 323 (Colo. 2003).

> Fit demands more than simple relevance; it requires that there be a logical relation between the proffered testimony and the factual issues involved in the litigation. That is, even if good grounds exist for the expert's opinion, it must be validly and scientifically related to the issues in the case. That particular expert testimony fits or is valid for one facet or purpose of a proceeding does not necessarily compel the conclusion that it fits all facets. Therefore, the admissibility of evidence must be evaluated in light of its offered purpose.

*Id.* (citations omitted).

¶ 19    There are two substantial risks associated with the admission of blind expert testimony. The first is that, as the supreme court recognized in *Venalonzo* (and as the trial court explicitly recognized in this case), most, if not all, expert testimony has the tendency to bolster the credibility of one or more witnesses. *Venalonzo*, ¶¶ 32, 36. When an expert explains why a witness might have acted in a counterintuitive manner, that explanation may bolster the credibility of that witness. *Id.*

¶ 20    But, "while such 'testimony may incidentally give rise to an inference that a victim is or is not telling the truth about the specific incident,' 'this fact alone is insufficient to deny admission of the evidence, because expert testimony generally tends to bolster or

9

attack the credibility of another witness.'" *Relaford*, ¶ 30 (quoting *People v. Koon*, 724 P.2d 1367, 1370 (Colo. App. 1986)).  That is, the bolstering effect is acceptable when the expert testimony is necessary to educate the jury regarding matters about which the ordinary juror has no knowledge.  When that is not the case, however, the bolstering effects of expert testimony are unacceptable.

¶ 21     The second danger of blind expert testimony is that the jury may find or infer that historical facts existed based solely on the expert's testimony, rather than on the historical evidence presented to the jury.[7]  On at least two occasions the supreme court has recognized a similar danger in other contexts.

¶ 22     In the jury instruction context in *Castillo v. People*, 2018 CO 62, the supreme court addressed the first aggressor exception to self-defense and, more specifically, whether an erroneously given first aggressor instruction was harmless when there was no

---

[7] An expert witness may rely on facts not in evidence when those facts are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." CRE 703.  But here, the expert was a blind expert and, by definition, knew nothing about the facts relating to the relationship between Cooper and L.K.

evidence supporting the instruction. A division of this court had reasoned that even if there was no evidence to support it, the error was harmless because if there was no evidence to support the instruction, the jury would simply disregard it. *Id.* at ¶ 47.

¶ 23     Rejecting that analysis, the supreme court stated that "we have repeatedly expressed concern that jurors might try to fit facts into an erroneously given instruction." *Id.* at ¶ 59. As the supreme court concluded in an earlier case, "[d]uring deliberations, it is possible that the jury may have wondered why it was given the instruction, decided that it must have been for some purpose, and forced the evidence to fit the instruction, thereby denying [defendant] his claim to self-defense." *Kaufman v. People*, 202 P.3d 542, 562 (Colo. 2009). The *Castillo* court relied on its earlier decision in *Barnhisel v. People*, 141 Colo. 243, 246, 347 P.2d 915, 917 (1959), where the court observed that an instruction which correctly states the law but is not supported by evidence erroneously "implies or assumes the existence of evidence not in the record."

¶ 24     The supreme court also explained that the danger of giving a jury instruction that is not supported by the evidence is

11

"exacerbated by the prosecution's misleading comments during its closing argument." *Castillo*, ¶ 60 (citation omitted).[8]

### C. The Expert's Testimony Did Not "Fit" With the Factual Evidence Presented

¶ 25 As stated above, expert testimony is only admissible when the proffered testimony "fits" the factual issues involved in the case. *Martinez*, 74 P.3d at 323. There was no such "fit" here.

¶ 26 No evidence presented to the jury proved or even suggested that prior to the charged incident Cooper had assaulted, or physically or nonphysically abused, L.K.[9] There was no evidence that Cooper exercised improper control over L.K. physically, emotionally, or economically. Nevertheless, the expert was permitted to give extensive testimony about how domestic abusers

---

[8] In a different context, the supreme court has held that evidence that suggests a screening process was used in the filing of the criminal case is improper because the jury is likely to infer that the case is stronger if it survived these unknown screening procedures. *Domingo-Gomez*, 125 P.3d at 1052-53.

[9] Given that evidence of similar transactions of domestic violence may be admissible in criminal prosecutions under section 18-6-801.5, we presume that if the prosecutor in this case had knowledge of any evidence of prior acts of domestic violence between Cooper and L.K., she would have sought to admit such evidence.

exercise such control and how that control contributes to or is associated with the "power and control wheel."

¶ 27     Neither was there any evidence of an escalating "cycle of violence," an attribute of many domestic violence cases and the essence of the "power and control wheel" emphasized by the expert. The only way the jury could have found that there was a pattern of abuse was from the expert's testimony — who, as a blind expert, purportedly knew nothing about the facts of this case.

¶ 28     The expert also testified that victims of domestic abuse often stay in abusive relationships and are then subjected to additional abuse.  If that opinion related to any material fact presented to the jury in this case, the expert testimony might have been appropriate because it is counterintuitive that an abused person would stay in such a relationship.  But, no evidence supporting that factual scenario was presented to the jury.  To the contrary, undisputed evidence established that L.K. immediately moved out of Cooper's house after the charged incident and never returned.[10]

---

[10] The Attorney General also argues that the jury might have been confused as to why it was necessary to subpoena L.K. to testify, thus justifying at least some of the expert's opinions.  But any issue

¶ 29    We acknowledge that Cooper and L.K. were in an intimate relationship. But, contrary to the argument made by the prosecutor, and apparently accepted by the trial court, the existence of that relationship alone does not justify the admission of the "power and control wheel" and other expert testimony regarding the characteristics of an abusive intimate relationship.

¶ 30    The Attorney General has not cited, and we have not found, a single case that stands for the proposition that the mere existence

---

in this regard was of the prosecutor's own creation. The jury heard no testimony that L.K. had refused to testify at trial. Thus, whether L.K. was under subpoena was wholly irrelevant to any legitimate issue. Despite this irrelevance, the prosecutor herself asked L.K. during direct examination if she was under subpoena. Subpoenaed or not, she was present and testified at trial, and no evidence was presented to the jury that she would not have been there if she had not been subpoenaed.

Moreover, almost all conscientious lawyers subpoena their witnesses, even when friendly, because if they do not and the witness does not show up, a continuance is unlikely. *See, e.g., People v. Dillon*, 633 P.2d 504, 507 (Colo. App. 1981) (holding that the trial court did not abuse its discretion in denying a continuance where the defendant did not show that an attempt was made to subpoena the witnesses before trial).

Similarly, the Attorney General's argument that L.K. did not want to be in court to testify proves too much and does not justify the vast reach of the expert's testimony. Few people want to be in court to testify and, for many, testifying is a harrowing experience. Nothing in the evidence presented to the jury indicates that L.K. had, at any time, refused to cooperate with the police or the prosecutor.

14

of an intimate relationship justifies the admission of this type of expert testimony. The Attorney General's reliance on *People v. Lafferty*, 9 P.3d 1132 (Colo. App. 1999), is misplaced. There, the court upheld "cycle of violence syndrome" testimony to explain the victim's recantation. *Id.* at 1134-35. But, as noted by the trial court, L.K. never recanted.

¶ 31 Examination of the chart contained in the Appendix further demonstrates that there was no record evidence that related to the vast majority of the opinions expressed by the blind expert. Even if some of the tangential opinions expressed by the expert were arguably supported by the record (and we think it is a stretch to so conclude), that very minor "fit" cannot excuse the admission of extensive irrelevant evidence of this type. *See* CRE 403. This is particularly the case when, as here, there were no third-party witnesses to the alleged crimes, and Cooper's criminal liability rested entirely on the jury's perception of the credibility of the testifying fact witnesses.

¶ 32 For these reasons, we conclude that the trial court abused its discretion in admitting the blind expert testimony.

### D. The Improper Admission of the Expert Testimony Requires Reversal

¶ 33    Our conclusion that the court erred in permitting the expert to express opinions wholly irrelevant to the factual questions before the jury does not end our inquiry.  We must also determine whether the admission of this testimony requires reversal.  *Hagos v. People*, 2012 CO 63, ¶ 8.

¶ 34    Ordinarily, the erroneous admission of testimony is evaluated under the harmless error standard.  *Pernell v. People*, 2018 CO 13, ¶ 22.  An appellate court reverses a criminal conviction only when the wrongfully admitted evidence "substantially influenced the verdict or affected the fairness of the trial proceedings."  *Hagos*, ¶ 12 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).  In evaluating whether the error requires reversal, the strength of properly admitted evidence supporting the verdict is one important consideration.  *Crider v. People*, 186 P.3d 39, 43 (Colo. 2008).  "If that evidence overwhelmingly demonstrates the defendant's guilt, the error must be disregarded as harmless."  *Ruibal*, ¶ 17; *accord Pernell*, ¶ 22.

¶ 35    Cooper claims, however, that he was deprived of a fair trial by the admission of the blind expert testimony, and therefore, that we should review his claims under the constitutional harmless error standard. When a defendant specifically identifies a constitutional right that is implicated by improperly admitted testimony and a contemporaneous objection is made, an appellate court reviews for constitutional harmless error. *Hagos*, ¶ 11. "These errors require reversal unless the reviewing court is 'able to declare a belief that [the error] was harmless beyond a reasonable doubt.'" *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). For this kind of error, the prosecution bears the burden of proving the error was harmless beyond a reasonable doubt. *Id.*

¶ 36    We need not determine whether the ordinary harmless error standard of reversal or the constitutional harmless error standard applies here because, for four reasons, we conclude that under the more stringent harmless error standard, reversal is required. *See Hagos*, ¶ 12 ("Reversal is more difficult to obtain under [the harmless error] standard than under the constitutional harmless error standard because [harmless error] requires that the error

17

impair the reliability of the judgment of conviction to a greater degree than the constitutional harmless error standard requires.").

¶ 37    First, the two critical issues for the jury to decide in this case were who initiated the altercation and whether L.K. suffered bodily injuries as a result of Cooper's criminal conduct. As to the first question, the jury had little to go on other than the testimony of L.K. and Cooper.

¶ 38    Cooper presented two defenses at trial — general denial and self-defense. He denied punching L.K., hitting her in the ribs, or hitting her with a tire iron. Instead, he testified that when she hit him on the head with the flashlight and bit his finger, he pushed her away from him on the forehead. He did not deny using force against L.K., but he did deny using the force L.K. alleged.

¶ 39    It was permissible for Cooper to present two alternative, if perhaps inconsistent, defenses. *People v. Wakefield*, 2018 COA 37, ¶¶ 42-43. He was entitled to argue that the assault did not occur in the way L.K. described, and that under his version of events his act of pushing L.K. was done in self-defense. Simply because Cooper denied L.K.'s version of events does not necessarily disprove his defense of self-defense. *See id.*

¶ 40     Second, although there was no historical evidence presented to the jury that Cooper and L.K. had a history of domestic violence, the extensive expert testimony[11] regarding domestic violence may well have caused the jury to infer that there *was* a prior history of domestic violence and that Cooper's alleged assault of L.K. resulted from, or was explained by, that supposed abusive relationship. Through the blind expert's opinions, the prosecutor invited (indeed, urged) the jury to speculate that there was a history of abuse or violence even though the jury heard no such evidence from any witness.

¶ 41     The dangers identified in *Castillo* (which are associated with a jury instruction that finds no support in the evidence) are equally present when a blind expert expresses opinions that find no support in the historical facts presented to the jury. The jury may have wondered why the prosecutor would spend so much time and effort presenting these domestic abuse opinions, and why the court would allow such opinions to be presented if L.K. and Cooper did not have a history of domestic violence. The jury, therefore, could

---

[11] The expert's testimony consumes almost fifty pages of the transcript in a trial that lasted less than two days.

19

have "decided that it must have been for some purpose, and forced the evidence to fit [the expert opinions] thereby denying [Cooper] his claim to self-defense." *Kaufman*, 202 P.3d at 562. And, as in *Castillo*, the prosecutor here extensively relied on the blind expert testimony in her closing arguments.

¶ 42 Third, to the extent that the blind expert testimony invited the jury to find nonexistent historical facts, the evidence was improper CRE 404(b) evidence. Even more troubling, the trial court did not require that evidence to withstand the rigors of the test of admissibility under *People v. Spoto*, 795 P.2d 1314 (Colo. 1990). Because the prosecutor never offered any specific other acts in evidence, the trial court never made the threshold determination that Cooper actually committed any of the acts which the expert testimony invited the jury to infer. *Id.* at 1318. Because prior acts of domestic violence suggest a person's bad character, the prosecutor was able to present improper character evidence about Cooper without any of the protections required by section 18-6-801.5, C.R.S. 2018, or *Spoto*.

¶ 43 Fourth, the expert testimony undermined Cooper's credibility. If Cooper and L.K. were in a violent domestic relationship, it is more

likely that Cooper committed the violent acts alleged by L.K. But, as stated above, there was no evidence of a pre-existing violent relationship. Therefore, the expert testimony improperly impeached the credibility of Cooper's denial of most of the alleged acts of violence based on evidence that did not exist.

¶ 44 The operative question here is not whether the jury was entitled to believe or disbelieve Cooper's version of events regardless of the admission of the expert testimony. Rather, we must determine whether the improper testimony impermissibly affected the jury's verdict and the fairness of the trial proceedings. *Hagos*, ¶ 12. For the reasons stated above, we conclude that the error in admitting the irrelevant expert testimony "substantially influenced the verdict [and] affected the fairness of the trial proceedings" and, therefore, was not harmless. *Id.* (quoting *Tevlin*, 715 P.2d at 342). We thus reverse Cooper's convictions and remand for a new trial.

## V. Issues That May Arise on Retrial

### A. Jury Instructions

¶ 45 Cooper also contends that the trial court erred in not instructing the jury on the requirement of unanimity. We reject this argument.

21

### 1. Standard of Review and Applicable Law

¶ 46  We review jury instructions de novo to determine whether they accurately informed the jury of the governing law. *Riley v. People*, 266 P.3d 1089, 1092 (Colo. 2011).

¶ 47  When a defendant is charged with crimes occurring in a single transaction, the prosecutor need not elect among the acts, and the trial court need not give a modified unanimity instruction. *Melina v. People*, 161 P.3d 635, 639-40 (Colo. 2007).

### 2. The Trial Court Was Not Required to Instruct on Unanimity

¶ 48  The prosecutor charged Cooper with third degree assault based on L.K.'s testimony that Cooper punched her in the face and ribs on the night of the altercation. We agree with the Attorney General that the allegations against Cooper concerned a short timeframe, a single incident, and one victim. The evidence "does not present a reasonable likelihood that jurors may disagree on which acts the defendant committed" regarding the third degree assault charge. Thomas v. People, 803 P.2d 144, 153 (Colo. 1990). Therefore, Cooper was not entitled to a unanimity instruction.

## B. Prosecutorial Misconduct

¶ 49   Cooper next contends that the prosecutor engaged in repeated instances of prosecutorial misconduct during closing argument. Because we do not know whether similar statements will be made at the retrial, we decline to evaluate these statements.

¶ 50   We note, however, that a prosecutor has significant latitude to comment on the strength and weakness of the evidence and to employ reasonable rhetorical devices in doing so. *Domingo-Gomez,* 125 P.3d at 1048-49. Nevertheless, a prosecutor may not express personal opinions regarding the credibility of any witness or opine on the guilt of the defendant. *Id.* at 1049. Nor may the prosecutor denigrate the defendant or his counsel. *Id.*

## VI. Conclusion

¶ 51   The judgment of conviction is reversed, and the case is remanded for a new trial.

JUDGE RICHMAN concurs.

JUDGE ROMÁN concurs in part and dissents in part.

23

JUDGE ROMÁN, concurring in part and dissenting in part.

¶ 52    I agree with the majority that allowing the testimony of the domestic violence blind expert on the concept of "power and control" was an abuse of discretion because it was irrelevant in this case.  No history of domestic abuse existed in the relationship between defendant and the victim.  As the majority notes, however, this does not end our inquiry.  And this is where I respectfully depart from the majority's analysis.  Specifically, I dissent because, on this record, the expert's testimony was harmless.

¶ 53    Although defendant pled the affirmative defense of self-defense, which is his right, he denied *any* involvement in *all* of the victim's injuries.  Coupled with the contemporaneously taken color photos of the victim's injuries, the victim's testimony, and the testimony of law enforcement officers, the jury was well within its right to simply not believe defendant's account of what happened regardless of the improper domestic abuse testimony.  Thus, I would conclude the error was harmless and affirm the jury's verdict.

¶ 54    Error in the trial process does not warrant the reversal of a conviction if it can be shown to be harmless. *People v. Summit,* 132 P.3d 320, 327 (Colo. 2006). An appellate court will disregard the error unless it "substantially influenced the verdict or affected the fairness of the trial proceedings." *Hagos v. People,* 2012 CO 63, ¶ 12 (quoting *Tevlin v. People,* 715 P.2d 338, 342 (Colo. 1986)). In evaluating such error, the strength of properly admitted evidence supporting the verdict is one important consideration. *Crider v. People,* 186 P.3d 39, 43 (Colo. 2008). "If that evidence overwhelmingly demonstrates the defendant's guilt, the error must be disregarded as harmless." *Ruibal v. People,* 2018 CO 93, ¶ 17; *accord Pernell v. People,* 2018 CO 13.[1]

¶ 55    The jury was properly instructed on defendant's affirmative defense of self-defense, and no one argues to the contrary. Notably,

---

[1] Here, the erroneously admitted evidence was limited to blind expert testimony. The blind expert did not know details of the case, had never met the parties, and testified generally about the counterintuitive behavior of domestic abuse victims. She offered no testimony that the charged crimes actually occurred, no opinion that any witness was telling the truth about the assault, and no statements that improperly vouched for the strength of the People's case. As will be seen, given the nature of the relationship between this particular defendant and victim, her domestic abuse testimony regarding "power and control" was irrelevant, but not prejudicial.

25

both the victim and defendant testified at trial. The victim testified first, and her description of what happened put the issue of whether defendant's response was reasonable squarely in front of the jury.

¶ 56    The People presented the first-person testimony of the victim, graphic color photographs of her injuries, and corroborative testimony from responding officers. Specifically, in addition to the color photographs, the victim's injuries were testified to in great detail, including:

- dried blood around the inside of her lips;

- one of her lips looking swollen;

- marks on her ribs;

- a "goosed out" bump on her head;

- another portion of her head looking "dented in";

- visible bruises on her nose, around her eyes, and on her ribs; and

- cuts on her face.

¶ 57    At this point, defendant could have acknowledged that he had struck the victim but argued that his actions were reasonable and in response to actions taken by the victim. This is the very essence

of the statutory defense of self-defense.  Had he done so, I would agree with the majority that the expert's testimony on domestic abuse highly prejudiced defendant's affirmative defense claim of self-defense because, in that scenario, the only way the jury could have decided whether defendant acted in self-defense would have been to analyze the contested evidence and consider the credibility of both defendant and the victim.  In that scenario, the irrelevant testimony of the expert witness could well have prejudiced defendant's case.

¶ 58 But that's not what happened.  Instead, defendant took his claim of self-defense off the table when he emphatically denied touching the victim, other than a push on the forehead.  The following colloquy on cross-examination of defendant makes this clear:

> Q. So you pushed her on her forehead?
>
> A. Yeah, I pushed her off like that (indicating).
>
> Q. You didn't punch her in the mouth?
>
> A. No, I didn't punch her in the mouth.
>
> Q. You didn't punch her in the ribs?
>
> A. No, I didn't punch her in the ribs.

> Q. Or elbow her in the ribs?
>
> A. No, ma'am, I didn't.
>
> Q. You didn't grab her by the jaw?
>
> A. No.
>
> . . . .
>
> Q. So aside from pushing her in the forehead, you never touched her?
>
> A. No, ma'am.

¶ 59    In my view, this testimony removed the possibility of a contested issue before the jury of whether self-defense was appropriate in this case.  This is because "[a] defendant asserting self-defense as an affirmative defense *admits* that his use of force satisfies the *elements of the charged offense.*  But the defendant also asserts that the *otherwise unlawful use of physical force* was justified because it was reasonably necessary to defend himself or another from the victim's use or imminent use of force." *People v. Tardif*, 2017 COA 136, ¶ 37 (emphasis added).

¶ 60    This point was not lost on the jury, which was given the following self-defense instruction.

> It is an affirmative defense to the charge of assault in the third degree that the defendant used physical force upon another person, one,

> in order to defend himself or another from what he reasonably believed to be the use or imminent use of unlawful physical force by the victim; and, two, he used a degree of force which he reasonably believed to be necessary for that purpose.

The language of the jury instruction tracked the language of section 18-1-704(1) stating that a person acts in self-defense by "using physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person." § 18-1-704(1), C.R.S. 2018. But, here, when the jury applied the evidence to the jury instruction, it must have realized that defendant's self-defense claim made no sense because (1) defendant testified he used *no* physical force on the victim and (2) he testified to using *no* degree of force rather than a reasonable degree of force in self-defense. In other words, through his own testimony, defendant blew up his self-defense theory. Rather than admit the crime charged yet seek to justify or excuse his conduct, defendant's testimony took it off the table as an affirmative defense.

¶ 61    At this point, the jury was entitled to conclude that defendant did not use a reasonable degree of force under self-defense law.

After all, rather than provide testimony as to why the force was reasonable, defendant denied, in toto, assaulting the victim, which was illogical under self-defense law, and which the People's admitted evidence at trial overwhelmingly refuted.

¶ 62    Of course, that still leaves defendant's alternative defense to these charges — straight denial.  Here again, once examined in isolation, and set next to the overwhelming and unrefuted evidence presented by the People, I am left with the firm conviction that the error in allowing the domestic violence expert's opinion was harmless.

¶ 63    As discussed, the overwhelming evidence of defendant's guilt in this case was established by properly admitted evidence.  In the face of this overwhelming evidence, I cannot find even a reasonable possibility that the outcome of the trial would have been different but for the expert's opinion regarding the "power and control wheel."  *See Krustinger v. People*, 219 P.3d 1054, 1063 (Colo. 2009) (making clear that the "substantially influence" standard for nonconstitutional error is a less onerous harmless error standard than the "reasonable possibility" standard for constitutional error).

¶ 64    So, while I agree the admission of the expert testimony was an abuse of discretion, I do not believe on this record that the expert's improper testimony "substantially influenced the verdict or affected the fairness of the trial proceedings," as required for nonconstitutional harmless error.  *Summit,* 132 P.3d at 327.

¶ 65    Because I conclude that the improperly admitted evidence was harmless, I respectfully dissent from the majority's decision to reverse defendant's convictions and remand for a new trial.  In all other respects, I agree with the majority.

Appendix

| Opinion of Blind Expert | Historical Evidence Presented Relating to that Opinion |
|---|---|
| Power and Control Wheel: How a person can abuse the other person in a relationship without ever physically touching them. | None |
| "So the first way that we talk about is emotional abuse, and that's name calling, put-downs, you're stupid, you're fat, you're ugly, you can't do anything right-type of abuse." | None |
| "Another form of abuse on that wheel is financial or economic. And it's very common for victims of domestic violence to be — not just be financially dependent on their partner, but for the partner to use that as a way to control them, as a way to make sure that they don't have any power of their own." | None |
| "The next one is isolation. So it's quite common for offenders to try and isolate their victims from their sources of support. So try and put wedge in between their relationships with family, friends, maybe their church support, whoever it is that supports them the most." | None |
| "The next thing on this wheel is minimizing, denying and blaming. When we say that, very often domestic violence offenders will say things like, I didn't do | None |

| | |
|---|---|
| that.  Well, if I did it, I didn't do — it wasn't really a big deal, and it was probably her fault anyway. So not taking responsibility for their own behavior is quite common." | |
| "The next thing on this chart is using children.  So domestic violence offenders know that it's really effective to threaten children or try and manipulate children in order to control their victim." | None |
| "The other thing on here is an attitude of male privilege. . . .  And by that, we mean that, you know, generally I think people agree that in a healthy relationship, you have two people that have equal say. . . .  But in these relationships very often the offenders have this attitude that I'm the king of the castle.  I'm the one who make the decisions.  I'm the one in charge." | Testimony from victim that she only had one 10-by-14 foot walk-in closet to store all of her things.<br><br>Cooper testified that victim made him kick all the other people living in his house out of the house, and made them move to the garage. |
| "So coercion and threats.  It's not at all uncommon for offenders to make really specific and direct threats, very clear.  If you call the police, if you tell anybody, if you don't do this or don't do that, then there will be this consequence.  So we see that regularly." | None |
| "Intimidation really falls on a spectrum.  It can be something very small like giving a person a look.  Now, we all — you know, that's sort of a common thing in | None, other than testimony relating to the charged incident. |

| | |
|---|---|
| relationships.  You give each other looks, and we sort of learn how to read our partners.  But what domestic violence victims will say is the look in this case means uh-oh.  There's — something really horrible is going to happen.  I may or may not know what I've done, but this is not going to be good.  Intimidation, though, can also be really extreme, like taking out a gun and waving it around without ever actually making a specific threat to do anything with it.  So that's in a real quick nutshell the power and control wheel." | |
| Why victims don't share what has happened: "Well, first of all, that's really common for victims of domestic violence, to kind of keep this secret and keep it quiet. There are lots of reasons for that. One of the most common reasons that I hear is that they're afraid, that they've lived with this person for a while and they absolutely believe that this person has the willingness and the capability to carry out any threats that have been made against them.  And so they — you know, out of a desire to keep themselves or maybe other people safe, they just keep this to themselves.  Another issue is just that they're extremely embarrassed, ashamed, humiliated." | Colloquy between prosecutor and victim establishing that the victim did not "really want" to testify and that the prosecution had to subpoena her. |

| | |
|---|---|
| "Another reason is that very often people who go into abusive relationships have grown up in relationships where they've seen this kind of behavior modeled, and they — it's sort of normalized for them." | Colloquy between prosecutor and victim that, at the time of the charged incident, the victim and her father were not on speaking terms. |
| "Another reason that I hear from victims is that they love this person.  You know, offenders are not abusive 100 percent of the time.  If they were, that would make it a lot easier.  But very often they can be quite kind and loving and charming and caring and, you know, be a really good partner.<br>In fact, one of the ways they're often described is as having a Jekyll and Hyde personality.  So they're — you know, can be this really great, wonderful person, and then this horrible ugly side that they show.  But because they have that loving side and that's there enough of the time, the victim in the relationship can think, well, you know what?  I'm going to just sort of put up with the bad things because I get enough good things out of this relationship." | Testimony from victim that in the beginning of their relationship Cooper was "sweet.  He was one of those charmers.  I don't know.  There were many things I liked about him.  I like how kind he was to not only me but other people.  He seemed to have a big heart." |
| "But in this case, you have offenders who are driven by their need for this power and control.  Like, I didn't write it actually on the board and I should have, but when you look at this more closely, you can see that power | None |

| | |
|---|---|
| and control at the core of this illustration.  And that's really the issue that offenders are dealing with.  Whenever they feel like they're losing some of their power, they're losing control over their partner, that's when they use these or other physical methods to gain that control.  That's what drives their behavior." | |
| Q: "Why would a victim keep talking to him?"<br>A: "So, first of all, again, that's really common.  I know it seems confusing, but it's not.  It happens regularly.  Almost everything that a domestic violence victim does, the thing that drives their behavior is keeping themselves safe.  So because they have been in this relationship, they've experienced all of these different forms of power and control, it often feels safer to them to be in communication with their offender so they can sort of gauge where that person is and gauge what their mood is like today.  Am I going to be safe today?  What are my next steps going to look like?  So a lot of it happens because they're trying to keep themselves safe.<br>And, again, remember, these guys are also — they have their good side.  They have their kind, loving, charming side.  That's | Colloquy between prosecutor and victim establishing that after the incident, the victim and Cooper spoke on the phone a number of times and that he "would tell me that he was sorry for what had happened.  The remorse wasn't about what he had done to me.  It was more about us not having the house and him being in jail."<br><br>And colloquy establishing that the victim and Cooper physically saw each other for half an hour one day, and that, at that time, the victim still had "feelings of love for him." |

| | |
|---|---|
| usually the side that you see after an abusive incident.  So a person being sorry and contrite and sending gifts and flowers and promising never to do it again and go to counseling, that's what the victim wants, right?  They want to stay in the relationship as long as there's no more abuse.  And if that's what they think they're going to get, that's a strong motivator." | |
| "In fact, the statistics show us or tell us that a victim leaves an average of seven to nine times before they leave for good." | Testimony from victim that immediately after the assault she moved out of Cooper's home and never moved back. |
| Q: "How does hurting a victim's animal play into the power and control?"<br>A: "So there are a couple of answers to that.  One is, it's really — it can be a really intimidating — we talked about intimidation — it can be a really intimidating gesture to take, you know, a little cat or dog or horse or whatever it is, something that the offender knows the victim really loves and cares for and hurt it.  Like, that sends a really strong message.  Look what I'm willing to do.  Look at the lengths I'm willing to go to.  That sends me a strong message, like uh-oh, this person is dangerous and I should be afraid." | Conflicting testimony from victim that during the incident her dog came into the bedroom and the dog "came at," barked or growled at, or "lunged" at Cooper.<br><br>And, testimony from the investigating officer that the dog "attempted to bite" Cooper. |
| Q: "How could it also come into play in the power and control | Colloquy between prosecutor and victim that victim was not |

| | |
|---|---|
| aspect that the offender is maybe decades older than the victim?" A: "Well, as I mentioned, it's not uncommon for people who have grown up in abusive situations to sort of find that again. And, you know, in psychological terms, if you're trying to work out issues with a parent in your mind, it wouldn't be at all uncommon to find somebody who is sort of similar in that way and try and work it out in your current relationship. So that could be one explanation." | on speaking terms with her father at the time of the incident. |
| Q: "Why might a victim after being physically abused and offered medical treatment refuse to go into treatment that day to be taken away to treatment?" A: "Well, there could be a number of answers to that. So it could be that they are scared. They've been told that, you know, if you talk about this, if you tell anybody, there will be a consequence to that. And so they want to sort of show their solidarity with the offender. No, I'm going to stay here. I'm going to stay by that person's side. It could be — you asked about animal abuse. It could be that the pet or a child or somebody else has been threatened and they think, I need to stay here to make sure nothing horrible happens while I'm gone. It could just be that they are minimizing | Testimony from victim that on the night of the incident she did not receive medical treatment, but that she did eventually go to a doctor. |

| | |
|---|---|
| their own, I'm okay.  I can handle this.  I don't need to go to the hospital.  I'll just sort of power through it." | |
| Q: "Why might an offender tell a victim to stop yelling for help?"<br>A: "Well, I guess I might need a little more context, but anytime — again, if an offender's behavior is motivated by power and control.  So that's just another way to control a person.  Literally telling them what they can say and what they can't while they're being abused, that's an ultimate expression of power." | Colloquy between prosecutor and victim establishing that on the night of the incident victim yelled for help out the bedroom window, and Cooper kept telling the victim to stop yelling. |
| Q: "How is this different from a normal fight between a couple?"<br>A: "So the distinction there is what's driving it.  Because everybody fights, right?  All of us have fights in our relationships; that's normal.  So the distinction is it becomes domestic violence when there's this patterned use of these tactics.  And you don't have to have all of the tactics, but a patterned use of tactics that are designed to coerce, manipulate, control another person." | None, apart from the factual basis of the charged incident. |
| Q: "Is it something that you see in domestic violence cases where the offender later asks the victim not to participate in court?"<br>A. "Oh, that's extremely common." | Testimony from the victim that Cooper asked her not to "come to court" at some point after the incident |